CAMMEYER and others v. THE CORPORATION OF THE UNITED
    GERMAN LUTHERAN CHURCHES IN THE CITY OF NEW
    YORK and GEORGE TIEMANN.

A right as a corporator in a religious society, is obtained by stated attendance on
    divine worship therein, and contributing to its support by renting a pew, or by
    some other mode usual in the congregation.
Such a right cannot be derived by descent from the founders of the society, or from
    the former contributors to, or worshippers in the same.
The association between a religious incorporation and its corporators, is voluntary
    on the part of the latter; and is dissolved by their withdrawing from attendance
    on its worship, omitting to contribute to its support, and uniting in the establish-
    ment of another like incorporation.
Two Lutheran churches or religious societies, each owning temporalities, though
    of unequal value, entered into an agreement for a union, to remain forever as one
    body, congregation or society, by a new name expressing such union; and by
    which their estates were to be consolidated for the common use and benefit, and

Cammeyer v. United German Lutheran Churches, &c.

the charge of their estates and concerns was intrusted to officers to be chosen out of the united congregation; with other provisions showing an entire union and consolidation into one body; and the agreement also provided that out of the property, the ancient church of one of the constituent societies should be rebuilt on the site where its ruins stood, for the use of the united congregation as soon as circumstances would admit.

The united body was immediately afterwards incorporated by the name agreed upon, and after twenty years, the corporation sold the site of the ancient church, and never rebuilt it.

In a suit brought by persons claiming to be corporators in the united church, and to be in part the representatives of the ancient congregation which owned such site, to compel the corporation to build and endow a church in pursuance of the terms of the union:

*Held*, 1. That all the property of the two churches became vested in the incorporation.

2. That the management and control of the same vested in the *trustees* as a distinct body, and to the exclusion of the elders and deacons.

3. That the same vested in the corporation as an individual body or unit, in trust for the maintenance of the faith, doctrines and discipline of the Evangelical Lutheran Church; and not for the benefit of the two former congregations connected together for certain purposes. The existence of both was merged in the union.

4. No member of either of the former churches had any greater, better or different right in the incorporated society, than the members of the other. The rights of all were equal and upon a common footing. And if the ancient site of the one had been built upon, the rights of the members of both in such edifice would have been equal in all respects.

5. That the agreement for the union did not constitute a trust or a covenant, for the rebuilding of such edifice on the ancient site, or elsewhere. It was merely an expressed intention, which the corporation and subsequent corporators might execute or waive, in their discretion.

6. If there had been a trust, the court from the lapse of time and the circumstances, would presume that the sale of the site and other appropriation of the fund, were by the direction and with the consent of those interested.

The *trustees* of an incorporated religious society can alone bind the corporation. The action of the *vestry* has no such force. And where the act relied upon was adopted at a meeting of the conference or council, which consisted of the minister, elders, deacons and trustees, convened in mass; the corporation was not bound, although a majority of the trustees were present.

Where the exercise of corporate acts is vested in a select body, an act done by the persons composing that body, in a mass meeting of all the corporators, or in union or amalgamated with other like bodies, parts of the corporation, is not a valid corporate act.

B. having purchased a church edifice at a public sale, in his own behalf, conveyed it to an incorporated Lutheran Church, (which had another place of worship,) for a consideration equal to three-fourths of its value, on certain express conditions, of which one was that divine service therein should be in the English language. After a trial by the grantees in the maintenance of such service, which did not

prosper, B. released them from all the conditions, except the one requiring it to be used as a Lutheran Church.  *Held*,

1. That on the execution of the deed there were no *cestuis que trust* in existence or in expectancy; but that it created a charitable use, the fund for which flowed from B. and the corporation, as donors, and the latter were the almoners of the charity.

2. That persons coming to worship in the edifice, acquired no rights, beyond the period for which they rented pews from time to time.

3. That the conditions in the deed were vested in B. alone, and his release was competent to extinguish them.

4. That joint contributors to a charity, vesting the fund in one of their number, may revoke the charity or alter its terms and conditions.

An offer to sell land at a fixed price, without more, is an offer to sell for cash.

The acceptance of such an offer, to bind the seller, must be simple, and without the addition of any new terms or qualifications.

Since the revised statutes, contracts for the sale of lands resting upon mutual promises, must be subscribed by both the buyer and the seller, to be obligatory upon the latter.

Aliens may be corporators and trustees in a religious corporation.

It is a fatal objection to a suit that a part of the complainants do not show any title to participate with the others, in the relief sought.

September 17, 18, 19, 20, 21; December 5, 1844.

THE bill in this cause was filed on the 18th day of April, 1840, by Augustus F. Cammeyer, Henry Otten, John F. Reinicke, John F. Thall, Henry Storms, Burnet Otten, Henry Budelman, Carsten Platt, Andrew Prosch, Harman Schilling, Henry Dusterkotter, Peter Aims, Benjamin Ogden, Andrew Surre, Adolph F. Ockershausen, Philip W. Engs, John F. Gardner, Roger Williams, William Johnson, and Christian Smack, against The Corporation of the United German Lutheran Churches in the City of New York, and George Tiemann; the latter being made a defendant as the president of the board of trustees of the corporation.

The bill and answer were very voluminous, and there was a great mass of documentary and other evidence, on which with the pleadings, the cause was brought to a hearing.

The principal important facts are fully stated in the opinion of the court. Some others, with the documents on which the chief stress was laid by the complainants, will be inserted here.

One of the latter was denominated the *Union Bond*; and was in these words:

" Articles of agreement, indented, made and concluded upon this sixth day of January, in the year of our Lord one thousand seven hundred and eighty-four, between the elders and deacons of the ancient German Lutheran Church in the city of New York, called Trinity Church, by and with the free consent and approbation of the congregation of the said church called Trinity Church, of the one part, and the elders and deacons of the German Lutheran Church in the said city of New York, called Christ Church, by and with the free consent and approbation of the congregation of the said church, called Christ Church, of the other part, witnesseth as follows, to wit :—First, that the said two respective congregations, being fully persuaded that it will promote their common interest and the cause of religion, to unite and become one body, congregation or society, have, therefore, united together, and by these presents do inseparably unite together, to be and remain forever hereafter, one body, congregation or society, to be known and distinguished by the name of the congregation of the United German Lutheran churches in the city of New York, and that in all contracts, sales, purchases, suits, controversies, and other transactions, respecting the said united congregations, their property, business or affairs, the style and title of the said united congregation shall be, "The ministers, elders and deacons of the United German Lutheran Churches in the city of New York," and that rulers, elders and deacons, and all other church officers who shall be intrusted with the care, charge, management and direction of the estate, interest and concerns of the said united congregation, shall be chosen in manner as theretofore hath been accustomed, but that such rulers, elders, deacons, and church officers, shall always be chosen by and out of the said united body, congregation, or society.

" Secondly, That all the estates, whether freehold, leasehold or personal, and all other of the effects and property, at this time belonging to either of the aforesaid churches, are, by these presents, consolidated into one common fund, for the use and benefit of the said united congregation, out of which fund all expenses attending the said united congregation shall be paid, and thereout the ancient Lutheran Trinity Church (where the ruins

now stand) shall be built for the use of the said united congregation, as soon as time and circumstances will admit.

" Thirdly, That the respective treasurers, and others who are accountable, shall as soon as it can be done with conveniency, render to the trustees to be appointed for the said united congregation, just and true accounts of all estates, effects, moneys and securities, belonging or appertaining to the said respective churches, and of all debts due or owing to or from the same churches, and of all deeds, writings, vouchers, books and evidences relating thereto separately, and shall deliver up all such estates, effects, moneys, securities, deeds, writings, vouchers, books and evidences, to the trustees of the said united congregation, to be kept in their charge for the use and benefit of the said united congregation.

" Fourthly, That regular books shall at all times hereafter be kept by the trustee or trustees of the said united congregation (for the time being) wherein shall be entered and set down an account of all moneys by him or them received, paid, laid out, and necessarily expended, and of all transactions, matters and things whatsoever, which may require the same. And that all persons whom it may concern, shall, at all seasonable times, have free access to inspect and look over the books so to be kept as aforesaid.

" Fifthly, That a meeting of the vestry, or of the said united congregation, shall be called so often as the business of the said congregation shall require. And that all officers necessary to serve the said united congregation shall from time to time be chosen out of and by a majority of the said united congregation, and such officers' salary (if any) to be in like manner stipulated and settled.

" Lastly, That only one minister shall be called for the service of the said united congregation, until there shall appear a sufficient income properly to support two or more ministers.

" In testimony whereof, we, John Baltus Dash, Frederick Reger, Diederich Heyer, Jacob Resler, the elders, Henry Arcularius, and Henry Bisher, deacons, of the said ancient Lutheran Trinity Church, and Philip Oswald and Alexander Fink, the elders, Henry Simmermans, Christian Shultz, and Anwick Earnish,

deacons of the said Christ Church, on the part and behalf of ourselves and the congregation of the said united churches, have hereunto set our hands and seals, the day and year first above written.

JOHN BALTUS DASH, [L. S.]        FREDERICK ⋈ REGER, [L. S.]
                                                  His
                                                  mark.

DIEDRICH HEYER, [L. S.]          JACOB RESLER, [L. S.]
                                                  His

HENRY ARCULARIUS, [L. S.]        HENRY ⋈ BISHER, [L. S.]
                                                  mark.

PHILIP OSWALD, [L. S.            ALEXANDER FINK, [L. S.]

HENRY SIMMERMANS, [L. S.]        CHRISTIAN SHULTZ, [L.S.]

                ANWICK EARNISH, [L. S.]

"Sealed and delived in presence of
    JAMES LINTILETTE,
    GIRARDUS HARDENBROOK."

In pursuance of this bond of union, the united churches in July, 1784, became incorporated by virtue of the act passed April 6th, in the same year, under the name of "The Corporation of the United German Lutheran Churches in the City of New York." And they continued from that time, to the era of this controversy, to worship as one congregation, using the German language, in the building known as Christ Church, and which had before the union, been occupied by the Christ Church branch of the United Churches.

On the second of February, 1802, two resolutions were adopted by the trustees of the corporation of the United Churches, in the words following, viz.

"Resolved, (on motion of Mr. Caman, seconded by Mr. Coester,) that it is the unanimous opinion of this board, that it is necessary for the benefit of this congregation that every Sunday afternoon, English service should be performed in Christ Church.

"Resolved, that if the vestry agrees to the wish of the trustees, the trustees will provide a generous recompense to Mr. Philip Meyer and Henry Muhlenberg to perform that service."

On the 15th of May, 1802, a petition, signed by two hundred and five members of the congregation, praying for the introduction of English preaching on Sunday afternoons in Christ

Church, was presented to a meeting of the vestry, (which vestry then consisted of the ministers, elders and deacons of the church,) and the vestry thereupon passed resolutions of which the following are a copy.

"1st. That it satisfactorily appeared, from the above signatures, that if the church council should introduce English preaching in the afternoon, it would be with the desire and consent of the congregation.

"2d. But a suspicion existed among many members, that after a while the service in the German language would be abolished. Therefore it is ordered that the German service in the afternoon shall only be so long discontinued till another opportunity shall present to rebuild our Trinity Church, or to provide in some other way for English service.

"3d. That before the alteration itself takes place, it will be necessary to give the pastor a new ratification of the salary promised him by the congregation, without the addition of any clause or proviso, the congregation not having made any at his election, and with the remark that the minister shall be entitled to the same, notwithstanding any alteration which shall be made with the advice and consent of the church council, in the divine service which this board advises the trustees to do.

"4th. That before the alteration in regard to the resolution of the trustees, of the first of February, one thousand eight hundred and two, take place, wherein they declare that if the church council agrees with the wish of the trustees, the trustees will grant a reasonable recompense to the Messrs. Meyer and Henry Muhlenberg.

"5th. That, however, the vestry will keep the further intention in a lively remembrance both what concerns the choice of a suitable assistant to our minister in the German and English languages, as also the establishing in the forenoon and afternoon service both in the German and English, by building up the church in Broadway, agreeably to the union bond.

"6th. That it shall, however, be fixed and determined, that so long as there are members in the congregation who hear and desire the German service, the German service shall be considered the principal divine service in the congregation.

" 7th. That the minister herewith has the consent of the vestry to permit English preaching in the afternoon as soon as he shall have received the ratification mentioned in resolution 3d, relating to his call."

These resolutions of the vestry were presented to the trustees, who, on the 25th day of May, 1802, adopted the following :

" Whereas the salary allowed to our present minister, Rev. John C. Kunze, consists of a free dwelling-house, eight cords of fire wood, and three hundred pounds current money of the State of New York, that is to say, seven hundred and fifty dollars, as stipulated in the call, and one hundred pounds like money, that is to say, two hundred and fifty dollars, having been added thereto, by the congregation, at a meeting of the same, which meeting was held agreeably to the charter of this corporation, for the express purpose, on the eleventh day of August, one thousand seven hundred and ninety-four. Which two aforementioned sums making together one thousand dollars, to be paid to him, the said Rev. John C. Kunze, annually, in four equal quarterly payments, viz., the one, on or about the first day of June, the other, on or about the first day of September, the next, on or about the first day of December, and the other, on or about the first day of March, in every year.

" And whereas the abovementioned salary to the said Rev. John C. Kunze is on his performing certain duties and services specified in his call, and as some alteration having been made, or to be made hereafter in the respective duties and services of the said Rev. John C. Kunze by the particular request and desire of the majority of our congregation, and by and with the consent and approbation of the vestry thereof, for the purpose of introducing the English language in part into our church service :

" Therefore, we, the trustees of the United German Lutheran Churches in the city of New York, in order to remove all doubts concerning the right and title of the said Rev. John C. Kunze to the abovementioned salary, do hereby declare and confirm to the said Rev. John C. Kunze the aforesaid salary, any alteration made or to be made in performing service in the English language in our church notwithstanding.

" On motion, unanimously resolved : That the seal of the cor-

poration be affixed to the above declaration, and that the chairman do sign the same."

In 1821, some members of the congregation of the United Churches, who were desirous of establishing worship in English, held a meeting and appointed a committee to concert measures for establishing an Evangelical Lutheran Church in connection with the United Churches in which service should be performed in the English language.

On the 16th of January, 1821, this committee made a report to a conference of the ministers, elders, trustees and deacons of the United Churches, strongly recommending the measure, and advising the raising of funds by subscription in aid of the object ; and submitting a series of resolutions, which were adopted by the conference in these words, viz. :

"I. *Resolved*, That it is expedient to take measures to establish an English Lutheran Church in this city, in connection with the present Lutheran Church.

"II. *Resolved*, That a committee be appointed to obtain information on the following subjects, without expense to the board :

1. The situation of suitable lots for a church.

2. The most favorable conditions on which they can be leased or purchased.

3. The plan of a new church.

4. The probable expense.

5. The amount that would be subscribed by the members, and by other persons friendly to the undertaking ; and,

6. Such other information as may be requisite to facilitate the attainment of our object.

"III. *Resolved*, That the said committee shall have power to associate with themselves such members and friends of the congregation as shall be ready to assist the committee in the prompt discharge of their duties.

"IV. *Resolved*, That the following articles shall be considered as the conditions on which subscriptions for a new church shall be received, and as the basis of a permanent connection between the old church and the contemplated church :—

"*Article* I. The money which shall be collected by the committee shall be placed in the Savings Bank of the city of New

York, until it shall amount to a sum that may be deemed suffi-cient to justify the erection of a new church.

"*Article* II. Should it appear, after a reasonable time, say one year or more, that a sufficient sum cannot be obtained by con-tribution, the deposited sums, together with the interest that shall have accrued thereon in the aforesaid Savings Bank, shall be refunded to the respective donors, their heirs or assigns.

"*Article* III. Should the undertaking succeed, the present church council or vestry shall be enlarged, and an equal num-ber of trustees, elders, and deacons, elected by each church, shall form one church council, and shall superintend the concerns of both churches.

"*Article* IV. All the annual expenses of the new church shall be paid out of the income of said church, and shall in no wise encroach on the personal and real estate of Christ Church.

"*Article* V. The two cemeteries or burial places, shall be held in common by both churches, subject to the regulations now existing.

"*Article* VI. As soon as requisite, the congregation shall call an additional pastor, who shall assist the present pastor, so that they shall alternately officiate in both churches, and in the Ger-man and English languages.

"*Article* VII. Divine service in the German language exclu-sively, shall be performed twice on every Lord's day, and once or oftener on festival days, in Christ Church, at the corner of Frankfort and William streets.

"*Article* VIII. Divine service in the English language exclu-sively, shall be performed three times in every Lord's day, and twice or oftener on festival days, and as often in the week as advisable, in the contemplated church.

> F. C. SCHAEFFER, *President of the Conference.*
> W. WHILMERDING, *President of the Trustees.*
> PETER SCHMIDT, *Secretary.*

*New York, January* 16*th,* 1821."

A subscription was commenced, and after a considerable amount was subscribed, at another conference meeting held on the 5th day of July, 1821, it was determined that the United

Churches as a corporation and society, should not take part in the raising of funds or in the erection of the proposed new church, and resolutions were adopted, in these words:

" Whereas, the committee appointed on the sixteenth of January last, in compliance with the second resolution, having reported progress, and stating that circumstances had arisen which made it necessary that the subscribers to the contemplated English Lutheran Church should themselves decide as to the disposition of the subscribed and deposited money: therefore, *Resolved*, That the said committee be discharged from any further consideration of the subject, and that the treasurer be authorized to hold the deposited sums to the order of the subscribers in their collective capacity.—*Resolved*, That the articles in the fourth resolution, be still considered as the basis of a permanent connection between the old church and the contemplated church."

The parties interested in the English church scheme thereupon proceeded to build a new church in Walker-street in the usual mode of voluntary contributions, and by means of credit, at an expense of thirty thousand dollars and upwards. It was called St. Matthew's Church. After the building was completed, efforts were made to connect it with the United Churches, and to have it form a part of that corporation and congregation; which efforts were steadily resisted by the latter corporation.

On the 20th of July, 1824, the church council of St. Matthew's filed a bill in equity against the corporation of the United Churches, setting up the Union bond of 1784, and the proceedings in 1821 upon which their enterprise was commenced, and claiming the benefit of the bond and a performance of the resolutions adopted by the conference in January, 1821.

On the 28th of February, 1825, by agreement of the parties thereto, the equity suit was abandoned and dismissed; and on the fourth of April following, the congregation of St. Matthew's Church became incorporated under the statute by the name of " The Evangelical Lutheran Church of St. Matthew's in the City of New York.'

This corporation was deeply involved in debt at its outset, and it soon became necessary to sell its real estate. Accordingly, in the fall of 1826, on its application to the Chancellor, an order

was made authorizing the corporation to sell its church edifice and lots, with the organ and other movable property. Under this order the same were sold at auction, to Benjamin Birdsall, for $22,750; and were conveyed to him by the corporation of St. Matthew's, absolutely and without reserve, on the 12th day of December, 1826.

On the 15th day of the same month, Birdsall conveyed the same to the corporation of the United Churches, receiving therefore the price paid by him. The property was intrinsically worth at that time, about $30,000.

The deed from Birdsall to the defendants contained certain conditions, which were as follows :

"First, that the said St. Matthew's Church shall be used and occupied by the said parties of the second part, for a Lutheran Church, in which divine service shall be performed exclusively in the English tongue, except that on particular occasions, and for peculiar solemnities, in cases of necessity, service may also be celebrated in the German tongue.

"Secondly. And further, that in case at any time hereafter it should be deemed expedient or proper by the said parties of the second part, their successors or assigns, to sell and dispose of the said church and premises, then, in that case, they, the said parties of the second part, their successors or assigns, shall put, or cause to be put up, in front of said church, and shall also publish in three of the daily newspapers printed in the city of New York (such notice to be continued for three weeks successively) a notice of their intention to sell and dispose of the same. And shall also in such notice offer the said church to such Germans, or descendants of Germans, (or members,) who may then be members of, or pew-holders in said church, at the sum of twenty-two thousand seven hundred and fifty dollars, which sum the said church now costs them, the said parties of the second part, together with all moneys that shall have been laid out in improvements thereon; they the said purchasers binding themselves, their successors and assigns, to use and occupy the same as a Lutheran Church, in which divine service shall be performed in the English language. But should this offer not be complied with, and the consideration money paid, within four

weeks after the first notice shall be so given as aforesaid, in such case a certificate shall be obtained from either the mayor, recorder, or first judge of the city of New York, that such notice has been given as is required in this condition, and that it has not been complied with ; which certificate shall be conclusive proof of its contents, and in such case, this second condition shall be null and void; and the said parties of the second part, their successors and assigns, shall be at liberty to sell and convey the said land and church free and clear from any restriction or condition whatever, excepting the seventh and eighth conditions.

" Thirdly. The trustees, elders, and deacons, of the said United German Lutheran Churches, together with their minister, and the minister of the said St. Matthew's Church, to be appointed as is hereinafter provided, shall make such rules, bye-laws, and regulations, for the government of said St. Matthew's Church, as to them shall seem meet, and the same at pleasure may revoke or alter.

" Fourthly. The trustees and the vestry and congregation of the said United German Lutheran Churches shall call a pastor or minister for the said St. Matthew's Church, and appoint all officers, and fix all salaries therein.   Provided, however, that after the death or resignation of the first pastor, so to be appointed as aforesaid, the male members or pew-holders of said St. Matthew's Church shall have the right to recommend a pastor for the said St. Matthew's Church by voting for the same by ballot, and shall and may present their recommendation to the said trustees and vestry of the United German Lutheran Churches, who shall be bound to appoint the person so recommended, or to reject him.   And the said trustees and vestry shall thereupon appoint such other person to perform divine service in the English tongue, as aforesaid, as to them shall seem fit and expedient, in the place of the person originally recommended.

" Fifthly. The said St. Matthew's Church shall be governed by, and its officers shall act under, the immediate direction of such bye-laws, rules and regulations, as may from time to time be made, as is hereinbefore prescribed.

" Sixthly. No moneys to be expended, or debt or debts contracted, on account of St. Matthew's Church, unless directed or

authorized by the trustees of the said United German Lutheran Churches.

"Seventhly. The rear gate in the iron railing on Cortlandt alley, shall be closed, and kept closed, permanently.

"Eighthly. In the basement story of St. Matthew's Church no other school shall be kept than a young ladies' school, or a school not more noisy and troublesome to the neighborhood than a young ladies' school. *Provided, nevertheless*, that none of the aforesaid conditions shall apply to, or affect in any way, or interfere with such conveyances of the aforesaid premises, by way of mortgage, as the said party of the second part, their successors or assigns, may deem it necessary from time to time to make and execute in the place of those mortgages now subsisting thereon, or that may be executed thereon, and not exceeding in amount the principal sum of sixteen thousand dollars. But it is expressly understood and covenanted, by and between the parties to these presents, that in case of a sale of the said premises under any mortgage, the surplus money over and above the payment of the incumbrances thereon, and after reimbursing the parties of the second part their expenditures therefor and thereon, without interest, shall be paid to the mayor and recorder of the city of New York, by them to be put out on interest, secured in the best manner, for the purpose of being applied to building or purchasing a new establishment for the English Lutheran Congregation."

The minister and most of the congregation of St. Matthew's, organized a new church called St. James, and became incorporated by that name on the 20th of February, 1827.

The corporation of the United Churches, instituted a service in English, in the edifice bought of Birdsall, and continued it for several years ; employing a minister for that purpose, and letting the pews to such as chose to attend. Their own proper service was continued at Christ Church, as before. Some of those who had belonged to St. Matthew's congregation attached themselves to this English congregation kept up by the United Churches.

The experiment of the English service was not successful, and the United Churches determined to abandon it. They thereupon on the 2d day of April, 1830, obtained from Birdsall and

his wife, a conveyance or indenture releasing and discharging. them from all the conditions contained in Birdsall's deed to them. before recited, except the seventh condition. The indenture however restricted the grantees from using or employing the. premises forever, for any other purpose or use than as a Lutheran Church.

The United Churches then concluded to sell their place of worship known as Christ Church, and to have divine service performed in St. Matthew's. To give the English service a further trial, they limited their own to the forenoon, and permitted the English congregation to occupy the edifice in the afternoon, and stipulated not to discontinue the latter, without giving a year's notice to the English church council.

That arrangement was carried into effect. The United Churches let the pews for both their own and the English service, and paid the minister who performed the latter.

The English congregation continued to decrease, and in 1839, had become very small, while the defendants' congregation, worshipping in German, rapidly increased. Early in that year, the defendants resolved to discontinue the English service, and gave due notice of their intention to the English congregation, on the 4th of February, 1839 ; and in April, resolved that the same take effect on the first of May, 1840.

This led to a protest and remonstance on the part of the English congregation, and a variety of negotiations, resolutions and proposals, which need not be set forth at large.

On the 25th of April, 1839, the trustees, and also the congregation of the United Churches, resolved to offer St. Matthew's church for sale at $22,750 to such Germans or descendants of Germans, of the English congregation, as might be members or pew-holders in the church ; the purchasers to bind themselves to use and occupy it as a Lutheran Church for divine worship in the English tongue.

On the 25th of December, 1839, the trustees put up in front of the church and published and continued for three weeks, in three daily newspapers, a notice to that effect, inviting written applications, and specifying that they would meet at the vestry room on the 3d, 10th, 17th, 24th, and 31st days of January.

They also published with it, an order of the recorder of the city attached thereto, approving the notice and offer, and declaring that if not complied with, he should give to the defendants such a certificate as was described in the second condition of Birdsall's deed.

Several attempts were made to purchase of the defendants under this notice.

The complainant, Cammeyer, on the 6th January, 1840, served on them a written notice, agreeing to take the church at the price and for the use proposed, adding, " terms of payment to be agreed upon." Next was a notice on the 17th of January, signed by Mr. Cammeyer as " purchaser," and Messrs. Birdsall, Otten, Reinicke, Aims, Ogden and Surre, as " committee," describing themselves as a committee of such Germans as the offer designated. This notice ratified Cammeyer's offer, and agreed to purchase on the terms of the defendants, provided a good and available title could be given.

On the 29th of January, another notice was delivered signed by Messrs. Cammeyer, Otten, Reinicke and Birdsall, referring to their former agreement, and stating their readiness to pay the price on receiving a deed approved by their counsel, Mr. Anthon, adding that the deed must be made to such persons in trust for the congregation, as counsel on both sides might deem it discreet ; and offering in the mean time, to execute any contract to bind the congregation of St. Matthew's, which might be deemed prudent, and might be approved by their counsel.

On the 31st of January, 1840, at a meeting of the elders, deacons and trustees of the United Churches, it was resolved, and the board of trustees resolved, that all offers made by their corporation for the sale of St. Matthew's Church, were at an end and determined. A copy of the resolution was delivered to the persons who had offered to purchase.

The bill in this cause was thereupon filed, and an injunction obtained restraining the defendants from interfering with the maintenance of the English service in St. Matthew's Church as it was then conducted. This injunction continued till the hearing of the cause. The Rev. Mr. Geissenhainer, the minister employed by the defendants for that service, in 1827, resigned his

charge in February, 1840. Upon this, the congregation of St. James joined the English congregation of St. Matthew, and bringing with them their minister, worshipped in St. Matthew's during the pendency of the suit.

The bill prayed that the corporation of the United Churches might be decreed, by reason of the alienage of many of the trustees and members, to be incompetent to hold the legal title of St. Matthew's Church; or that it might be decreed to hold it in trust for the complainants and those represented by them, or for the descendants of the founders of the original churches; and for an account of the property of Trinity Church and its accumulations, and of the contributions made for the erection of St. Matthews, and that both of those funds might be decreed applicable to the payment of the purchase money of St. Matthew's Church; or that the corporation might be decreed to carry into effect the contract of sale of St. Matthew's Church and premises, made with the complainants or some of them, by the notice, offers and acceptances, before stated and which occurred in January, 1840; or for a specific performance of the Union bond, and all and singular the resolutions and articles stated in the bill; and for general relief.

The answer, amongst other things, set up by way of demurrer, that the bill was multifarious, and that there was a misjoinder of the complainants; also the want of equity, and want of parties.

*Henry M. Western* and *John Anthon*, for the complainants.

*Edward Sandford* and *Charles O'Conor*, for the defendants.

THE ASSISTANT VICE-CHANCELLOR.—In order to understand the cause of the controversy between these parties, and the grounds of the claim made by the complainants, it is necessary to trace the history of the defendants' church, from its origin in this city.

There were a few Lutherans among the first emigrants from Holland to this province, and there is no doubt but that they were driven from Holland by the persecution of the Arminians,

and those holding kindred tenets, which had been denounced by the Synod of Dort in 1618, 1619.

They were relieved from persecution here, but were not permitted to worship together in public, until after the province became a British colony. At that era, they had become so numerous, that they sent to Germany for a pastor, and one arrived here in 1669. About the year 1671, they erected a log church at the south-west corner of Broadway and Rector-street, which was known as Trinity Church. The ground on which it stood was granted to them by the government, in 1674. Sometime between 1725 and 1740, this edifice was taken down and a substantial stone building erected in its stead. Besides the contributions of the members in New York, aid for this object was obtained from other denominations here, and from Lutherans in London, Amsterdam, Hamburg, and in other parts of Europe.

There is no question but that, until after the year 1700, and to near the period of re-building Trinity Church, the service of the church was exclusively in the *Low Dutch or Holland language*.

In 1710 and 1711, a large body of German Protestants, principally Lutherans, driven from the Palatinate by the intolerance and persecution of the Elector and the Roman Catholic clergy, found their way to the colonies of New York and Pennsylvania. Emigration from Germany has steadily continued from that time to the present, with but trifling interruptions; whilst the influx of Hollanders substantially ceased in the seventeenth century. In consequence of these various causes, the German portion of the congregation of Trinity Church became so numerous, that about the time of their rebuilding the church edifice, it was necessary to have service occasionally in German, and it was had accordingly every second or third Sunday.

This did not prove satisfactory to all the German members, and prior to 1750, a large body of them detached themselves from the Trinity congregation, and established a separate church known as Christ Church, in which the service was in the German language exclusively, until after the revolution.

Dr. Henry M. Muhlenberg, in his reports to the mission establishmment at Halle, gives but a sorry account of the spirit and temper of these seceders. It seems that they endeavored to ob-

tain half of the property of Trinity Church, as Dr. M. says, "in. order to be able to appoint any vagrant as their preacher." They failed to obtain any aid from that quarter.

Nevertheless they persevered, and in process of time, bought a site, and erected a substantial stone church, at the corner of, Frankfort and William-streets, which was afterwards known as Christ, or Swamp Church. After Christ Church was established, the congregation of Trinity consisted in part of the Low Dutch and their descendants, and in part of Germans. Mr. Muhlenberg officiated for them at intervals, his regular charge being. in Pennsylvania. On a Sunday in September, 1750, he preached for them for the first time. The service was in German in the morning, and in English in the afternoon. He states as a reason for preaching in English, that he was not sufficiently conversant with the Low Dutch. The congregation in attendance, he says, was small. In May, 1751, he was with them again, and on the 19th preached both morning and afternoon in German. On the 26th of May, he preached English in the morning, and Low Dutch in the afternoon.

The German portion of the church complaining that they could. not understand those languages, the Church Council, on the 28th May, decided that there should be delivered on every Sunday one Low Dutch and one German sermon.

In July and August, he preached in English on Sunday evenings ; and he pursued the same course in the summer months in 1752, which was the last of his ministration here, so far as we know from his reports to Halle. The English preaching drew. a large crowd to the church, but the congregation was not large. In 1751, he relates that about fifty partook of the sacrament of the Lord's Supper, and in 1752, about forty.

These reports show that both of the Lutheran churches were at that period in a feeble condition. Trinity Church was unable to support a minister, except he devoted a fourth of his time elsewhere. They could pay him for preaching three Sundays out of four. Their church was called the Low Dutch Lutheran Church, while Christ Church was exclusively a German, or High Dutch Church.

In 1752, the latter made overtures for a re-union, which were

rejected by Trinity Church, because of the debt incurred for the building where the Germans worshipped.

· A proposition made the same year, that Trinity Church should have service in Low Dutch and English only, so that their German members might be induced to go over to Christ Church, was also rejected by the Church Council of Trinity.

There is but little testimony in relation to the two churches from this period until the peace of 1783. The evening preaching in English was kept up a part of the intervening time, as appears by the testimony of the aged witness, Ressler. Trinity Church was burnt during the revolution; and at the close of the war, both churches were destitute of a pastor. From Dr. Kunze's report to Halle, it seems that before the British evacuated the city of New York, he had been invited by both congregations to visit and advise them. He came from Philadelphia for that purpose, brought the two Church Councils together, and succeeded in uniting them in January, 1784. At this time, Christ Church was still in debt, and Trinity had a considerable property. Dr. Kunze became their pastor, and preached to them in the edifice erected by Christ Church.

The union was effected by an instrument in writing, signed by the elders and deacons of both churches, and which will be more fully stated hereafter. The two congregations and their temporalities having thus been united together into one church, became incorporated in July, 1784, as one church, under the act of April 6, 1784, by the corporate name used by the defendants in this suit.

For this history, prior to the union of the churches in 1784, I am principally indebted to the Reports to the Orphan House at Halle, (*Hallische Nachrichten,*) and to Dr. Schmucker's Retrospect of Lutheranism in the United States.

After the union of the churches in 1784, the two became completely amalgamated into a single congregation, which continued its worship in Christ Church until after the origin of the present controversy. Dr. Kunze was their pastor from 1784 until his death in 1807, and preached uniformly in the German language, although he confirmed occasionally in English.

In 1794, the Rev. Mr. Strebeck who taught the school attached

to the church, commenced preaching in English at the request of a part of the congregation, and continued it on Sunday afternoons and evenings for about two years, but without any regular call as minister. After he left, there was occasional preaching in English at intervals, by persons not employed by the trustees, until 1802.

In May, 1802, a petition for the introduction of English preaching on Sunday afternoons, signed by 205 members of the congregation, was presented to the vestry of the church, consisting of the minister, elders and deacons. The trustees had in February before, by resolutions, expressed their opinion in favor of having English service in the afternoon, and offered to provide a generous recompense to two young students of divinity then under Dr. Kunze's care, if the vestry would agree to have them perform that service. The vestry, on receiving the petition, passed certain resolutions, which in substance declared, that on the trustees ratifying anew the salary and contract of Dr. Kunze, he might permit English preaching in the afternoon; that a suspicion existed among many members, that on this being done, the service in German would, after awhile, be abolished; that, therefore, they ordered that the discontinuance of German in the afternoon should only last until another opportunity to rebuild Trinity Church, or to provide in some other way for English service; and that it should be fixed and determined, *that so long as there are members in the congregation who desire the German service, such service should be deemed the principal divine service in the congregation.* They also resolved to keep the further intention in lively remembrance, of establishing both the German and English services by building up the church in Broadway, agreeably to the union bond.

On the 25th May, 1802, the trustees ratified Dr. Kunze's call with the modified duty remaining in the new state of things; and the two students, Messrs. Philip Meyer and Henry A. Muhlenberg, were employed to perform English service on Sunday afternoons. It does not appear how long this service was continued, but it was not many years; for prior to the last war, most of the congregation, who desired to have English preaching left the old church, and established a new one called Zion Church,

where English service alone was performed by the Rev. Mr. Strebeck ; and on this event, the English service in the old church was discontinued.

In 1805, the corporation of the United Church, with the assent of the entire congregation, sold the site of Trinity Church to the Episcopalians.

Not long after the death of Dr. Kunze, Mr. Schaeffer became the pastor of the United Churches.

It was agreed by the counsel, that Zion Church was burned down in 1814, within a few years after it was founded, and the congregation was broken up. Probably a part of it came back to the United Church. At all events, in 1821, the English party in the latter had again become numerous, and they set on foot a new project to build a church for English service, in connection with the United Church. A committee, appointed by that part of the congregation, made a report to a conference meeting, consisting of the trustees and vestry of the United Church, setting forth the inducements to the undertaking, and proposing a subscription and experiment to ascertain whether a new church could be built without involving the property of the existing church, and that the two churches should be superintended by one board or church council. The committee appended to their report a series of resolutions, which, with the report, were adopted by the conference meeting. The resolutions approve the undertaking ; direct a committee to be raised to obtain information as to the site, plan, cost, and subscriptions, for the new church ; and provide certain articles as the basis of a permanent union. Those articles prescribe a deposit of the moneys raised in the Savings Bank, and that they shall be refunded to the subscribers, unless in a year or more sufficient was obtained by contribution, to justify the erection of the new church ; that if the project succeeded, the annual expenses of the new church should be defrayed out of its own income, and should in no wise encroach on the estate of Christ Church ; and that divine service in German exclusively should be performed in Christ Church, and in English exclusively in the contemplated church.

These proceedings were had on the 16th day of January, 1821. Subscriptions were made for the new church to a considerable

amount, and some moneys paid to the treasurer of the United Church, but without the trustees' sanction. In this stage of the affair, another conference meeting of that church was had on the 5th day of July, 1821, and a resolution adopted, stating that the committee appointed under their resolution in January, had reported that circumstances had arisen which made it necessary that the subscribers to the contemplated English Lutheran Church, should themselves decide as to the disposition of the money subscribed and deposited; and thereupon resolving that the committee be discharged, and that the treasurer be authorized to hold the deposited sums to the order of the subscribers collectively. They also resolved that the articles of the fourth resolution of January 16, 1821, be still considered as the basis of a permanent agreement.

The trustees of the corporation did not act as a separate body, on either of these occasions.

The subscribers to the new church proceeded, elected a provisional council, which included in its number the minister of Christ Church, Mr. Schaeffer, and several of the members of the Conference of the United Church, purchased the ground in Walker-street, and erected the church edifice thereon, which is the subject matter of this suit. The new church was called St. Matthew's, and divine service was first performed in it on the 22d of December, 1822.

In 1824, the new church attempted to carry out the union of government expressed in the resolutions and articles adopted by the United Church in January, 1821, and gave notice to the latter of the time and place of an election to be held for their proportion of the officers. They held such election, and notified the defendants of the result, and requested a joint meeting of the church council. The defendants declined to meet with them, stating that their board was full, according to the charter and church ordinances.

The congregation of St. Matthew's was deeply involved in debt by the erection of their church, and applied to the corporation of the United Church for a union of the temporalities of the two churches. This was also declined. The St. Matthew's people then filed a bill in equity against the defendants,

alleging that the latter were bound to aid them and unite with them in their enterprise, as well by the proceedings of the Conference meeting in January, 1821, as by the bond of union in 1784, and asking a decree accordingly. This bill was filed August 30th, 1824, and amongst the complainants I find Gen. Storms, and two others who are complainants in this suit. The equity suit in 1824 was defended by the United Churches.

On the 25th of February, 1825, the provisional Church Council of St. Matthew's, resolved to withdraw their bill and the claims therein set forth against the United Churches. The bill was accordingly dismissed by consent, on the 28th of February, 1825.

On the 4th of April, 1825, St. Matthew's Church became incorporated under the statute. Messrs. Storms, Surre, and Smack, of the present complainants, were in the first board of trustees of St. Matthew's.

The Rev. Mr. Schaeffer had become their pastor on the church being finished in 1822, and the service was conducted in the English language.

Mr. Geissenhainer, senior, succeeded him in the pastoral charge of Christ Church, and conducted the service there in German.

St. Matthew's Church was soon overwhelmed with its great debt, and on the 10th day of November, 1826, the church and lots in Walker-street were sold at auction to Benjamin Birdsall, for $22,750, and the sale was ratified by an order of the Court of Chancery. Mr. Birdsall was a member of St. Matthew's Church, but he bought the property on his own account and responsibility, and received an absolute conveyance thereof. On the 15th of December, 1826, he sold it to the corporation of the United Churches, at the price for which he purchased it. Their deed from Birdsall contained certain conditions for the maintenance of English worship, and for the pre-emption of the church to an English Lutheran congregation in case of a sale ; which will be more fully examined hereafter.

After the sale of the church was directed by the trustees of St. Matthew's, Mr. Schaeffer resigned his pastoral charge.

Soon after the sale, it appears that he had organized another English Lutheran Church, which was incorporated by the name

of *St. James*, on the 21st day of February, 1827. Mr. Storms was one of the signers of the certificate of the election of the officers of the new corporation, and two of the now complainants, Messrs. Storms and B. Ogden, were elected trustees. Mr. Hoxie, a witness for the complainants, proves that the congregation of St. Matthew's, constituted the new church of St. James; and St. Matthew's, as a distinct church and corporation, ceased to exist. The church of St. James worshipped at the new Jerusalem Chapel in Pearl-street, and subsequently in Orange-street.

In the mean time, the defendants had taken possession of the St. Matthew's Church property, and called the Rev. Mr. Geissenhainer, junior, the son of their minister, to preach in that church in the English tongue. The call was during good behavior, and so long as they should be able to keep St. Matthew's without injury to the maintenance of their worship in the German language. On the 30th of March, 1827, the defendants, in conjunction with their two ministers, established by-laws and regulations relative to the congregation and worship in St. Matthew's, pursuant to one of the provisoes in Birdsall's deed.

Thus matters continued for about three years, when the defendants determined that their effort to keep up English worship in St. Matthew's had proved unsuccessful, and resolved to abandon the attempt. During the three years, it had cost the defendants $5000, to maintain that service in St. Matthew's, beyond all the income derived from the church. About half of this deficiency was covered by contributions made for the purpose of enabling them to try the experiment. St. Matthew's Church contained one hundred and sixty-three pews suitable to be rented to stated hearers, of which not more than forty were rented by members of the English congregation. And at the same time, the defendants' old edifice, Christ Church, had become insufficient for the use of their own congregation.

Under these circumstances, on the 2d of April, 1830, they induced Mr. Birdsall to release to them all the conditions contained in his conveyance of St. Matthew's Church, (except the seventh, relative to the use of an alley;) and substituted the simple condition that it should be always used as a Lutheran Church. They then resolved to sell Christ Church, and they removed their own

congregation to St. Matthew's where they have worshipped ever since. They still kept up the English service in the afternoon, Mr. Geissenhainer, Jr., continuing the pastor of the English congregation; and they agreed with the English church council, to give them a year's notice of any alteration in the arrangement for such worship.

The defendants always rented the pews of the church from this time, both for the German and the English services, and collected the rents, and they paid the salaries of both pastors until 1840. Eearly in 1839, the defendants concluded to discontinue the English service. They show that their German congregation had become very large, and contained nearly three hundred paying members. On the other hand, the English congregation had diminished since 1830, and the number who paid pew rents, in the spring of 1840, was only eight.

In February, 1839, the trustees of the defendants, by resolutions, notified the English congregation of their purpose, proposed to aid them in obtaining another place of worship, and suggested to them to re-unite with the congregation of St. James's Church.

The English congregation protested against the discontinuance of their worship in St. Matthew's, and claimed the benefit of the conditions in Birdsall's deed. Mr. Geissenhainer, Jr. also protested, setting forth his rights under his call as the pastor of that congregation.

Committees of conference from the defendants' board of trustees, and from the vestry of the English congregation, met; and a committee from the vestry of St. James's, met with the latter; and finally all three committees convened together. The committees from St. James's and from the English congregation of St. Matthew's, proposed to the defendants, that the latter should build a new church for themselves, and that the St. James's Church should unite with the English congregation of St. Matthew's. The defendants declined the proposal, and nothing was effected by the conferences.

On the 24th of April, 1839, the congregation of the United Churches, adopted certain resolutions, which were also adopted by the trustees on the ensuing day, and then communicated to the English congregation of St. Matthew's. By those resolutions

they rescinded those of February, 1839, and declared that they could not keep St. Matthew's Church as their property, without injury to the maintenance of their worship in German; that they would not permit the English congregation to use the church after May 1st, 1840, and would not after that day, maintain the English service there; that St. Matthew's be offered for sale to the English congregation, for the cost price of $22,750;—and that a suitable site be procured and an enlarged church be erected for the use of the German congregation.

In December, 1839, the defendants published an advertisement in the newspapers, offering St. Matthew's Church at the price of $22,750, to be used as an English Lutheran church.

In January, 1840, sundry members of the English congregation of St. Matthew's, (and several of the complainants were among them,) together with some members of St. James's Church, made various offers to accept of the defendants proposal, and to purchase the church. These offers were not responded to by the defendants, and at the expiration of the time limited in the advertisement, they declared that their proposal to sell was at an end and determined.

These transactions will be treated of more at large, in discussing the complainants claim to a specific performance.

On the 28th of January, 1840, the defendants settled with Mr. Geissenhainer, Jr., and his call as pastor was determined. He, however, preached for the English party until January, 1843. On the 2d of February, 1840, the vestry of the English congregation of St. Matthew, and the board of trustees, elders and deacons of St. James's, met together in St. Matthew's, and resolved to maintain their rights to the latter church.

Immediately after Mr. Geissenhainer retired, the congregation of St. James's, with their pastor, Mr. Martin, came into St. Matthew's Church, and uniting with the English congregation, have worshipped there on Sunday afternoons ever since, and have sold their Orange-street church.

This accession was not satisfactory to some of the latter congregation, who called another pastor, Mr. Mealy, and their Sunday school refused to unite with that of St. James's. The pastor of St. James's continued to officiate, and Mr. Mealy never

entered upon the duty of pastor. The bill in this cause was filed in April, 1840.

The various grounds urged by the complainants, and the relief sought both in the bill and by their counsel at the hearing, will appear in the progress of the decision.

The bill is exhibited by twenty persons, who allege in the outset that they are pew-holders and members, or late pew-holders or members of St. Matthew's Church; and they insist that they are the *true and only corporators* of the United German Lutheran Churches, and as such, entitled to all the muniments, benefits, and advantages of the corporation. They also allege that many of them are lineal descendants of the original worshippers, founders, and contributors to the Lutheran churches and estate, called the Trinity and Christ Churches.

Their claim as the *only corporators* of the United Churches, is equivalent to saying that those who were trustees and members of the vestry of that corporation when the bill was filed, were not corporators, nor entitled even to a vote in that church. This allegation is the more surprising, because a brief consideration will show that not a single individual of the twenty complainants, was then a corporator in the United German Lutheran Churches.

Their counsel stated that the eleven complainants first named in the bill were the vestry of the English congregation of St. Matthew's; and the other nine were members of the vestry of the incorporated church of St. James.

So far as the evidence shows, the great majority of the complainants never were members of, or attached to, the United Lutheran Churches. None of them have been members of that church, or worshipped in it, since St. Matthew's Church was erected. Previous to that time, Mr. Storms, and perhaps one or two more of the complainants, worshipped in Christ Church, and were then corporators of the United Churches. Their right as such corporators was derived, not from their descent from either Germans or Hollanders, but from their stated attendance upon divine worship in that church, and contributing to its support, by renting a pew, or other usual mode, in the congregation.

They may have attached themselves to the new church of St.

Matthew's, with the expectation that it was to be a scion of the old Christ Church, and subject to the same government. But when they proceeded to incorporate St. Matthew's, and organized it as a distinct and independent congregation, they entirely relinquished such expectation, if it were ever entertained.

After the United Churches became the owner of St. Matthew's and maintained the English service there, the congregation who availed themselves of that service, were not members of the corporation of the old church, nor did they ever claim to vote at the election, or participate in the control of the affairs of the United Churches, either spiritual or temporal. Indeed, in the outset of the arrangement made after Birdsall's conveyance, all of the complainants who had been members of St. Matthew's appear to have abandoned it and joined in the establishment of St. James's. A few of them returned to the English congregation of St. Matthew, but at what time, is not disclosed by the testimony. After the United German Churches removed to St. Matthew's, there was no change in the rights of the two or three complainants last mentioned. They hired pews, but it was for the English service. They did not attend apon the service of the United Churches, or worship with them. They were no more corporators of the latter, than so many Presbyterians would have been, who were permitted to use the church edifice on Sunday afternoons. By the statute of 1784, no member was entitled to vote for trustees in this corporation, unless he was a stated attendant on divine worship in the church or congregation. The same provision in substance, is contained in the existing statute relating to Religious Incorporations. (1 Greenleaf's Laws, 75; 3 Rev. Stat. 2d ed. 209.)

Aside from the statute, the withdrawal of these complainants from Christ Church, in 1822 or 1823, was a severance of their connection with that corporation. The association was voluntary in the first instance, and was manifested by their attendance upon the public worship in the church, and contributing to its support. They had a right, at any time, to dissolve the association; and their leaving the church, and omitting to contribute, indicated that they had availed themselves of such right.

The law is so adjudged, in effect, in several of the states. In

the case of *Den on the demise of De Mott and others* v. *Bolton and others*, 7 Halsted's R. 206, 214, in the Supreme Court of New Jersey, each party claimed to be the lawful and sole trustees of the Reformed Dutch Church in the English Neighborhood, which was an incorporated church, attached to the Classis of Bergen, and the General Synod of the Reformed Dutch Church. In 1824, a part of the congregation, including the elders and deacons, who are by law the trustees, resolved to withdraw, and separate themselves from that Classis and Synod, alleging that the Classis and Synod had tolerated false doctrines, and passed unconstitutional orders. The church consistory unanimously resolved upon such separation, and attached themselves to the Classis, and ultimately to the Synod, of the *True Reformed Church.* The Classis of Bergen immediately suspended the minister, deposed the members of the consistory, and ordered a new election to be held for elders and deacons. The members of the church who adhered to the Bergen Classis, met accordingly, and elected a new set of elders and deacons. The court held that the latter were the legal trustees of the church, and entitled to its temporalities. The Chief Justice says that, "to constitute a member of any church, two points at least, are essential, without meaning to say that others are not so : a profession of its faith, and a submission to its government." "Simply holding the same faith, without submitting to the government and discipline of a church, cannot make, or keep a man a member of that church." "These persons, then, after they withdrew, did not continue members of the Reformed Dutch Church, simply because they held the same religious faith and tenets with the members of that ecclesiastical body." Mr. Justice Drake said: "The defendants obtained the right to office and the custody of the temporalities of a church, by connecting themselves with it, and by submitting to its government. If they have become tired of the church or its government, they certainly may exercise the right of withdrawing from it ; but they cannot reasonably expect to carry off its offices and its property with them."

In *Curd* v. *Wallace*, 7 Dana's Kentucky Rep. 190, 196, which is stated more fully hereafter, the court said ; "Without the statute of 1814, we should be of the opinion that the expelled and

seceding members of that church, so long as they remain out of it, could not justly claim a right to any use of it, or control over it." In that case, some of the members of the Baptist Church became Reformers or Campbellites, seceded and organized a new society, and then claimed an equal use of the meeting house of the old church.

In *Baker* v. *Fales*, 16 Massachusetts Rep. 488; *a majority of the parish* in the first church in Dedham, called a minister who was not approved by *a majority of the members* of the church. The latter, with the defendant, one of the deacons, met and worshipped with some of the parish, at another house. They kept up the christian ordinances and public worship, and claimed to be the first church; but they did not afterwards attend public worship in the meeting house. The majority of the parish continued to occupy the house with their minister as formerly. The church was not incorporated, and their property by the provincial act of 1754, rested in the deacons. It was held, that the members who remained, constituted the church in that parish, and retained the rights and property belonging thereto; and that the members of the church who withdrew from the parish ceased to be the first church in Dedham.

The same principle was declared by the court in two subsequent cases in Massachusetts; *Oakes* v. *Hill*, 10 Pick. 333, and *Keith* v. *Howard*, 24 ibid. 292; where the result was however, controlled by their peculiar statutes relative to territorial parishes.

In *The Inhabitants of Harrison* v. *The Inhabitants of Bridgeton*, 16 Mass. 16; on the division of the town of Bridgeton and erection of Harrison, the latter was to receive its proportion of the property and rights of the old town. Bridgeton had a fund for the support of the ministry. The court held that this fund belonged to it as a *parish*, and no part of it went to the new town of Harrison.

The same decision substantially was made in the case of *Brown* v. *Porter*, 10 Mass. 93.

In the case of *Weckerly* v. *Geyer*, 11 Serg. & Rawle's R. 35, 39, Geyer brought a suit against the inspectors of an election, held in October, 1821, in the Lutheran Church of St. Michael and Zion, at Philadelphia, for refusing to permit him to vote.

He had been long a member, and held a pew there, and paid his rent, until after 1821, but he had not communed since 1788. In 1818, Geyer with ninety-six members of that church, had formed a society for instructing young Germans in the principles of the Lutheran Church, in the English language. They called a permanent minister, who was authorized to confirm and administer the sacrament; purchased a burial ground, and held their meetings for religious worship at the old academy in North Fourth-street. It was contended that Geyer and his associates had separated themselves from the original church, and had forfeited their right to vote at its elections. The Supreme Court of Pennsylvania decided, that these circumstances should have been submitted to the jury, upon the question whether Geyer had separated or not. Chief Justice Tilghman said he did not think that the formation of such a society, was *per se* a separation from the other congregation; that a man might separate himself from a religious congregation at his pleasure, and thereby cease to be a member of the corporation. And this separation might be manifested in various modes, independent of any proceeding by the church itself. See also, *Smith* v. *Smith*, 3 Desauss. Eq. Rep. 557, 582.

This disposes of the claim of the complainants, that they are corporators in the defendants' corporation.

In reference to the complainants being pew-holders in St. Matthew's Church, as alleged in their bill, it is not admitted, nor is there proof of it, except as made by the defendants. Their testimony shows that Messrs. Cammeyer, Storms, Otten and Prosch, were such pew-holders. The others do not appear to have rented pews there in the years 1839–40; and nine of them were avowedly members of St. James's Church, having no connection with St. Matthew's.

The allegation of their descent from the original founders, contributors and worshippers, in Christ and Trinity Churches, is no better sustained by the proof. The only attempt at proof, is in the case of Gen. Storms. As to him, it is shown that his wife is a grand-daughter of Jacob Ressler, a German who came here about the middle of the last century, and was an elder in Trinity Church in 1784. This does not reach to the foundation or endowment of either of the old churches; and I need not dwell on

the utter groundlessness, in a legal point of view, of a claim founded upon Mrs. Storms descent from a corporator or member who never had any other or better right in the church property than Mr. Storms himself had before he withdrew from Christ Church.

I. The first prominent ground urged in behalf of the complainants, is under the terms of the agreement for the union of the churches in 1784, usually called the *Union bond.* They aver that the property of the churches was thereby vested in the United Churches, upon a trust to rebuild Trinity Church on the old site, and to maintain two ministers, of whom one should preach in English.

They further argue, that the bond, with the subsequent acts of the United Churches in regard to English preaching, establish a positive contract to endow a separate church for that object. It appears to me that there are many insuperable difficulties in the way of sustaining either of these positions.

1. What was the situation of the property of the two churches when the union took place?

They were both voluntary associations, and their property was held in trust by private individuals, for the purpose of sustaining the preaching of the gospel and the administration of the sacraments according to the faith, doctrine and discipline of the Evangelical Lutheran Church. It is probable that in the lapse of time, the legal title to the real estate of Trinity Church was no longer to be traced ; but in whomsoever it was vested, it was upon that trust.

It is alleged, that in Trinity Church, the trust was to sustain English preaching at least one-third of the time.

In truth, if there were originally any trust as *to language,* in that church, it was unquestionably in favor of the Low Dutch. But when the contributions were raised for building the stone church of Trinity, (and those gifts were the chief endowments which it received from private donors,) it had already become a Low Dutch and German Church. We have every reason to believe that they were given for the church as it was.

The evidence is conclusive, that for half a century before the

union, those languages were the regular instruments of religious instruction in the church. During more than half of that period, it is true, there was a strong desire on the part of some, to have a part of the services in English; and there was, doubtless, an increasing necessity for it in respect of those children of the members who had been brought up in this country. I have stated all the evidence of the use of the English service, and it appears to have been inconsiderable, attended with embarrassment for the want of books, and looked upon with distrust and dislike by the main body of the church.

The resolution of the 28th of May, 1751, mentioned by Dr. Muhlenberg, requiring on every Sunday, one Low Dutch and one German sermon, is decisive, that the English preaching was an innovation which was not countenanced by the authorities, nor engrafted upon the regular administration of the church.

The language of the Union bond deserves consideration on this point. The one society is described as "the *ancient German* Lutheran Church in the city of New York, called Trinity Church," and the other as "the *German* Lutheran Church, called Christ Church." Thus both are described as *German* Lutheran Churches, and their future name was to be the *United German* Lutheran Churches. Their proper ecclesiastical cognomen was, "*Evangelical Lutheran* Churches;" and this use of the word "*German*" which was probably their common designation amongst their neighbors, strongly indicates the character of both churches at that time, in respect of *language* and nationality.

If the use of a particular language ever had any influence upon the trusts under which the property was held; by a long and uninterrupted usage, and the entire assent of those interested, the German language had become as much of the essence of the trust, as the language of Holland. But there was neither usage nor assent to the permanent use of the English tongue.

In reference to the force of the early usage, I will refer to the case of *Curd* v. *Wallace*, 7 Dana, 190, 195, where a meeting-house had been erected by voluntary contributions, and dedicated by the contributors, for "*the benefit of the Baptist society*." A Baptist Church was shortly after organized, and took posses-

sion of the house, and had for fourteen years used it as their house of public worship. A controversy having arisen between that society and a seceding branch of it, called the *Campbellites*, the Court of Appeals in Kentucky held that the old church or society which had been so long permitted to use and control the house and ground, without any complaint or question, had a right still to enjoy the use of it as beneficiaries of the trust estate.

The decision in that case turned upon what the court designated the anomalous and perplexing provisions of a statute of Kentucky.

In regard to the temporalities held by the Swamp Church, there is no question as to the trusts. The German language was that of its foundation, and no other had been used in its worship down to the era of the union.

The result is, therefore, that at that era, there was no trust attached to the property of either church which required preaching, or any portion of the service, to be performed in the English language.

2. I will next consider what was the influence of the union upon the trusts which were attached to this property.

The agreement for the union is made between the elders and deacons of Trinity Church of the one part, and the elders and deacons of Christ Church of the other part : each acting by and with the free consent and approbation of their respective congregations. It recites, that both congregations are fully persuaded that it will promote their common interest and the cause of religion, to unite and become one body, congregation, or society ; and they have, therefore, united together, and thereby did inseparably unite together, to be and remain forever thereafter one body, congregation, or society, to be known as the congregation of the United German Lutheran Churches. They appointed the style and title by which their property, business and affairs were to be conducted. The charge, direction and management of their estates and concerns were intrusted to officers to be chosen by and out of the united body or congregation. All the estates, whether freehold, leasehold, or personal, and all other of the effects and property then belonging to either of the churches, were thereby consolidated into one common fund, for the use and benefit of

the united congregation; out of which all their expenses were to be paid, and thereout the ancient Trinity Church, where the ruins then stood, was to be built for the use of the united congregation, as soon as time and circumstances would admit.   Only one minister was to be called for their service until there should appear a sufficient income to support two or more ministers.

There were various other stipulations and provisions relative to the consolidating of the property and its management; all of which are expressed to be of and for the united congregation, and for their use and benefit.

Within six months after the union, the congregation was incorporated by the name of " *The corporation of the United German Lutheran Churches in the city of New York.*" It is not questioned but that this act was done with the concurrence of the whole congregation, and Dr. Kunze refers to it in his reports to Halle, as being a subject of congratulation to the church.

The corporate name differed slightly from that adopted at the union.   That it was the act of the same minds who effected the union, is apparent from the fact, that among the nine trustees first elected, were seven out of the ten elders and deacons who executed the articles of union; four of them having belonged to the Trinity vestry, and three to that of Christ Church.

Upon the united church becoming incorporated, all their united and consolidated property became vested in the corporation.   1 Greenl. Laws, 72, s. 4; *Baptist Church in Hartford* v. *Witherell*, 3 Paige's R. 296; *Potter* v. *Chapin*, 6 ibid. 639; *Trustees of South Baptist Church* v. *Yates*, 1 Hoff. Ch. R. 142; *The City of Cincinnati* v. *Lessee of White*, 6 Peters' U. S. Rep. 431. And see *Trustees of Watertown* v. *Cowen*, 4 Paige, 510.

One other effect of the incorporation was to give the management and control of the property to the *trustees* as a distinct and independent board in the church, and to the exclusion of the elders and deacons.

The effect of the union and the incorporation, was to vest all the property of Trinity and Christ Churches in the corporation of the united churches *as an individual body*, an unit, in trust for the maintenance of the Evangelical Lutheran doctrines and discipline in the congregation composed of the united churches.   Not

for the benefit of the congregation of Trinity *and* the congregation of Christ Church, as two bodies having formed a connection for certain purposes. Those separate congregations had ceased to exist. There was no longer a German society of Lutherans called Christ Church, or an ancient Low Dutch and German Society known as Trinity Church. The existence of both had been merged in the union. Their component parts, without any further distinction, constituted the single, homogeneous body or society, known as the United German Lutheran Churches.

No member of that society who came from Trinity, could say that he had any greater or better right or interest in the use or benefit of the property which the corporation derived from Trinity, than his brother who came from Christ Church, without ever having been within the walls of Trinity. The rights *of* each and of all were equal and upon a common footing. Each could exercise the same direction and control in their temporal affairs ; and in the same manner, namely, by his vote in the choice of trustees.

But it is said that there was a further trust raised by the union *bond, to wit,* to rebuild Trinity Church and provide therein preaching in English at least one-third of the time.

As to the latter branch of the trust, what I have already said will suffice to show that there was no such trust attached to the property of Trinity before or at the time of the union. If it was created at all, it is to be found in the bond. There is not, however, a word on the subject in that instrument. It purports to be a union of two German Churches for their mutual benefit. The objects of the union are well and strongly expressed. And when we look beyond the writing, which does not declare that the German language is to be used, although for a German Church that would be inferred ; we find that of the two uniting churches, one had never used any other tongue—that in the other the staple languages used were the German and Low Dutch, and that they came together to worship in a temple where the English was an unknown tongue, and called a pastor to preach in German exclusively. It is impossible to say, that because they had occasionally used English in Trinity, that the old Germans of Christ Church intended, in the union, to build a new church to

continue the use of that language in behalf of the united societies.

The subsequent occasional use of that language by assistant ministers in the united churches does not strengthen the inference. For thirty-seven years next succeeding the union, those instances were limited to two periods, 1794 and 1802; and in both they were of brief continuance. On no occasion, during that time, so far as the proof shows, were the efforts to have English preaching put upon the ground of a right under the union bond, or even an intention at the union that such preaching should be provided. This omission in the petition of the two hundred and five members in 1802, is evidence that there was no such contemporary understanding of the terms of that instrument.

The intention to re-build Trinity Church, does not carry with it a design to establish *English preaching* there. The design is equally inferrible, that the two churches expected to abandon Christ Church and all worship in the new Trinity whenever their increase in numbers and estate would warrant its erection.

And again they were as likely to want English preaching in Christ Church at the end of twenty years, as in any other; and they might not want it at all. Suppose that in 1802, they had rebuilt Trinity Church. What member of the United Society could then say that he was entitled to worship there, in preference to any other? Could the witness, J. D. Ressler, for instance, have said that he emanated from Trinity, and therefore had a right there to the exclusion of the children of Philip Oswald, or any other former member of Christ Church? These questions must be answered in the negative. All were equal in their rights and privileges.

To what end then, and for whose particular benefit, were the churches to make a trust for the English language, if such an idea had been in contemplation at the union?

There is still another view of this point. The persons administering the property of Trinity Church, in January, 1784, were not the donors of that property. They had no right to divert it from the original trusts upon which it was bestowed, nor to carve out new trusts in respect of it. They were simply trustees, and had come into the administration in consequence of being

members of the society by voluntary association. They could unite with another society for the promotion of the great objects of the founders of the church, but I doubt whether they could impress upon the estate a new trust which, in the event, might possibly promote those objects, and would be quite as likely to defeat them.

Then as to the other branch of the alleged trust, the intention to rebuild Trinity Church.

Here again the inquiry arises, who were the beneficiaries in this trust? Not the former Trinity members of the United Church, because their character as such was lost at the union. There were no more Trinity, no more Christ Church people. They were all United Lutherans. And the union bond declared that they were united *inseparably*, were to *remain forever one society*, and all the estates were to be consolidated into one *common fund* for the use of the united congregation.(a)

It is perfectly manifest that there can be nothing like a trust predicated of this declaration, that Trinity Church should be rebuilt. All the existing members of the two churches, all who had interests for the time being, as pew-holders and stated worshippers in either, were merged in one common mass of corporators. The rights of property were vested in the corporate body, to be exercised by trustees. All alike could influence their exercise. No one could set up his judgment against that of the trustees, and say, the time has arrived for rebuilding Trinity, and if you will not proceed with the work, I will file a bill in chancery on the ground of a trust, and compel you to do it. His remedy was to reason with his brethren and bring them into the same views, and then elect a board of trustees who would agree with him in opinion.

Still less can it be said that there were persons without the congregation, who could set this up as a trust. It would be positively absurd for a stranger, even for a Lutheran of another society, to interpose and tell the trustees of the United Churches

---

(a) See *Verplanck* v. *Mercantile Insurance Company*, 1 Edw. Ch. R. 84, as to the relation of trustee between a corporation and its members.

that it was high time for them to rebuild old Trinity Church; that their means were abundant; and the good of the community required another Lutheran Church.

The only reasonable view of the matter, in my opinion, is, that there was a design, an intention on the part of the vestries who formed the union, to rebuild Trinity Church at some future day, and to have two churches or parishes under one corporate head; similar to the parishes of Trinity, St. Paul's, and St. John's Churches of the Protestant Episcopal Church in this city, which constitute the corporation of Trinity. They, doubtless, cherished the hope that their slender number, the impoverished and disheartened remnant of the two churches, would be increased, by emigration and other accessions, and that with increased means, they might fill and sustain two Lutheran Churches. But all this was to be the work of time, and was intrusted to the trustees of the united and inseparable society which they were organizing. It was an intention which they entertained. Their successors, representing the united society, might entertain it also, or they might abandon it. The judgment of the congregation, reflected through trustees of their own selection, was necessarily the forum to which the vestries of 1784 left the ultimate disposition of this, and all other matters respecting their temporal estates. The law of the land was their guaranty that those estates should never be diverted from the support of the Evangelical Lutheran faith. But whether that faith should be inculcated in one church or in two, in Christ Church or in a new Trinity, was left to the discretion of the next generation.

As there was no trust to rebuild Trinity, so there was no covenant or agreement to that effect which can be enforced. The parties to the Union bond, upon its execution, all became on one side of the question, and there was no party of the other part, or covenantee. The signers, if there were any contract to build, were all covenantors. The corporate body which succeeded them, represented both covenantors and all the supposable covenantees.

Next, the intention declared in the Union bond, was fully abandoned in 1805, and the site of Trinity Church sold by the United Churches. In this act there was the concurrence of the

trustees, in whose discretion and judgment was vested the fulfilment or abandonment of that intention, and of the whole congregation who, as the members then composing the society, were the *cestui que trust*, or beneficiaries, if any trust to rebuild ever existed.

The proceeds of the sale were used for the benefit of the united congregation, as was prescribed by the Union bond. This proceeding is a perfect answer to the argument founded upon the resolutions adopted by *the vestry* of the United Churches in May, 1802, in which they say they will hold in lively remembrance the building up the church in Broadway. Three years afterwards, the Broadway lot was sold, with the assent of both the vestry and the petitioners of 1802. The *trustees*, who alone could bind the corporation, were not parties to those resolutions. And their exercise of their discretion by selling the lot, put an end to the intention which their predecessors had entertained.

It is now more than sixty years since the union of the churches.

Without resorting to lapse of time as a bar to a direct trust, the court is at liberty to presume from it, that the employment of the trust funds in a particular manner, has been by the direction and with the consent of those interested.

Thus in *Attorney General* v. *Scott*, 1 Vesey, Sen. 413, which was a bill relative to the election of a minister to the parish of Leeds, Lord Hardwicke held that disusage for a long time of certain prescribed acts in reference to the election, was evidence that they had been laid aside by the common consent of the parishioners.

*In re Chertsey Market*, 6 Price's R. 261, the trustees of a parish charity, vested, amongst other property, with a market house and ground, in consequence of the decayed state of the building, re-built the market, and with the general consent and approbation of the parish, erected it in a more convenient place within the ville. The Chief Baron of the Court of Exchequer held that it was no breach of trust.

Here, from 1784 to 1840, there was a considerable, and latterly a large body of members of this United Church, who, if the complainants' view of the Union bond be correct, at any time within

the last forty years, might have coerced the trustees to rebuild the Trinity Church. No one has attempted it, except in the way which I shall presently mention. All have rested content with the course pursued. And nearly forty years ago, all the then members concurred in the trustees selling the site of the old church, the identical ground upon which, by the terms of the Union bond, it was to be rebuilt.

If there had been something more than an intention expressed, and a discretion vested in the trustees who succeeded to the vestry of the United Churches, I think that these circumstances ought to put at rest forever any question as to the rebuilding of Trinity Church, founded upon the provisions of the agreement for the union.

The withdrawal of the suit in 1825, and the delivery up of the Union bond itself by those who prosecuted that suit, should be deemed an acquiescence in the course pursued by the corporation, by all of the now complainants who ever were members of the United Churches. Those complainants were parties in that suit, setting up the bond and seeking to enforce it. They dismissed the suit, and the President of their Council, in communicating their determination pursuant to their direction, transmitted the bond on which it was founded, to the pastor of the United Churches. This marked abandonment of the claim, in connection with the lapse of time and the sale in 1805, presents another formidable obstacle to the complainants' case founded upon the bond.

After this examination of the case, it is needless to dwell upon the claim that the acts of the defendants subsequent to the bond, in establishing English preaching, make out with the bond, a contract to build a church and endow it for that object.

It will be seen that the trustees, as such, never participated in those acts till after the purchase of St. Matthew's, and then allowed an English congregation to use their building as an experiment. The individual members of the latter, only acquired rights from year to year as pew-holders and members of such congregation.

There was no semblance of a contract to build or endow a church for the English service.

Finally, assuming all that the complainants contend for in regard to the Union bond, what right do they present to the court for seeking to enforce it? One of their counsel went so far as to say for them, "*we are the old Trinity Church.*"

I have before shown, that no one of the complainants had been a member of the congregation of the United Churches for sixteen or eighteen years before filing this bill; and not more than two or three had ever been members of that society. The only pretence for their being the old Trinity Church, rests in the proof that the wife of one of the complainants is a grand-daughter of one who was a member of that church before the union. The right of that member in the United Churches did not survive him. It was not inheritable, and no more transmissible by descent than his Lutheran faith. The bill could not be sustained by these parties on the Union bond. Even if the two or three former members of the society could assert a claim after so long a separation from it, they could not join with them the incorporated church of St. James as parties complainant.

II. The next claim which I will examine, is that made upon the events concurrent with the erection of St. Matthew's Church.

It is said that the erection of St. Matthew's was a substituted performance of the agreement to rebuild Trinity; and that the defendants, by their corporate acts, had set it apart forever as an English Church, provided they were able to sustain it.

I am perfectly satisfied that there was *no corporate act* of the defendants in relation to the building of St. Matthew's. The resolutions, both in January and July, 1821, were the acts of a *conference* of the United Churches, or the Church Council, which, by their ordinances then in force, consisted of the minister, three elders and six deacons, convened in a mass meeting with the nine trustees. The trustees did not act as such in a conference meeting.

At the meeting on the 16th of January, 1821, there were present the minister, five trustees, two elders and six deacons; in all, fourteen persons alike entitled to vote; and if all the trustees had voted against the resolutions, they would nevertheless have been adopted. It appears that the report of the committee of the

English petitioners was accepted unanimously, and the resolutions were adopted. It is not so stated, although I infer from the minutes, that the resolutions were also unanimous. There is no statement of any dissent, and a majority of the trustees (though not summoned to a meeting of trustees) were present at that meeting of the council.

The conference or council, was a board clothed with the spiritual regulation and government of the church. It had nothing to do with the control or direction of its temporalities. The statutes vested those duties in the trustees.

The fact that a majority of the trustees were present, *acting as a council*, does not make the resolutions of the council the act of the board of trustees.

Suppose in the case of a bank, that at a general meeting of the stockholders, certain resolutions should be adopted to sell land, or do any other corporate act, and it should be made to appear that all the directors of the bank were present and assenting to what was done; the corporation would not be bound unless the directors, at a meeting of the board, should concur in the resolutions.

The directors in the bank, and the trustees in this case, are, by the charter, the select class or body which is to exercise the corporate functions. In order to exercise them, they must *meet as a board*, so that they may hear each other's views, deliberate, and then decide. Their separate action, individually, without consultation, although a majority in number should agree upon a certain act, would not be the act of the constituted body of men clothed with the corporate powers. Nor would their action in a meeting of the whole body of corporators, or of another and larger class in which they are but a component part, be a valid corporate act. In thus acting they are not distinguishable from their associates, and their action is united with that of others who have no proper or legal right to join with them in its exercise. All proper responsibility is lost. The result may be the same that it would have been if they had met separately, and it may be different. In the general assemblage, influences may be brought to bear upon the trustees, which, in their proper board, would be

unheeded; and no one can say with certainty, that their vote in the latter event would have been the same.

It was held in the *Case of the Corporations*, 4 Coke's Rep. 77, b. that where the power to make a bye-law was in the mayor and aldermen, a bye-law made by the mayor, aldermen and commonalty, was void. And see *Ex parte Rogers*, and note *a*, 7 Cowen, 526, 530; *The King* v. *Miller*, 6 Term Rep. 268; Willcock on Munic. Corp. 101, 102; *Brown* v. *Porter*, 10 Mass. 99, per Sewall, J.

If, however, this were otherwise, and the concurrence of a majority of the trustees, acting in the conference, made the resolutions a corporate act; so much of them as indicated any intention on the part of the United Churches, as a corporation or society, to do any thing towards building the new church, was rescinded at a like conference meeting where all the trustees were present. If the act of five trustees in January was valid, that of the whole nine in July, convened in the same manner, must be equally binding.

When the resolutions were adopted in July, 1821, nothing had been done, so far as the proof discloses, which could not have been recalled. The bill says, considerable progress had been made in raising subscriptions;—nothing more. The subscribers, and those interested in the new enterprise, were then apprised, if they were not before, that the old church would bear no part of the expenses, either of erecting or sustaining the new church. The subscribers could have suspended their proceedings and abandoned the work. If they went forward with it, it was with full knowledge that it must be upon their own resources, and that their only union with the old church would be one for spiritual purposes.

I think, also, that the proceedings of the conference in January, 1821, do not indicate any design on the part of the old church to lend pecuniary aid to the undertaking. They proposed a subscription for the object; not to disburse from their treasury. Unless a sufficient sum was obtained by contribution to justify the erection of a new church, the money collected was to be refunded to the donors. And careful provision was made, if the enterprise succeeded, that the annual expenses of the new

church should in no wise encroach on the estate of the defend-ants.

It is difficult to perceive how any one subscribing before July, 1821, could have imagined, from the resolutions of January pre-ceding, that the corporation of the United Churches were pledged to use any part of their funds in building the new church.

Aside from the resolutions of the conference, there is no testi-mony from which any corporate liability on the part of the de-fendants can be set up or inferred. The receipt of the subscrip-tions, prior to July, by their treasurer, was not authorized by either the trustees or the conference. The resolutions of January, 1821, provided for a deposit of the collections in the Savings Bank. In July, it appearing that they had come into the trea-surer's hands, the conference directed him to hold them subject to the order of the subscribers to the fund, and discharged them-selves from any farther care of the same.

The complainants do not found their claim upon their being subscribers to the erection of the new church, who paid their money upon the faith of being sustained by the defendants. They do not allege that they were contributors to it. A few of them appear to have participated in its organization, and also in the subsequent suit in equity.

Although the dismissal of that suit prevents it from being a technical bar to a new suit upon the same state of facts; yet I think that the voluntary abandonment of the suit, the procuring St. Matthew's to be incorporated as a distinct society, thus effect-ing an entire separation from the old church; and the subsequent lapse of time, (about sixteen years,) ought to preclude those par-ties who were then complainants, from any farther litigation of the matters then in controversy.

III. The complainants found another portion of their bill upon the conditions contained in the deed of St. Matthew's Church executed to them by Benjamin Birdsall.

The conveyance was in fee simple, with certain *conditions* therein expressed, which I will proceed to state. 1. That the church should be used and occupied by the defendants as a Lu-theran Church, in which, except on particular occasions, divine

service should be performed exclusively in English. 2. That in case it should be deemed expedient by the defendants to sell the church, they should, by public advertisement in a prescribed mode, offer it at the price which they had paid for it, and the cost of subsequent improvements, to such Germans, or descendants of Germans, who might then be members of, or pew-holders in the church; the purchasers binding themselves, and their successors and assigns, to use and occupy it as an English Lutheran Church. But if the offer was not accepted, a certificate that such offer was made and not complied with, was to be obtained from the Mayor, Recorder, or First Judge of the city of New York, which certificate should be conclusive proof of its contents, and then the second condition was to be void, and the defendants at liberty to convey the same free from all conditions, except the seventh and eighth. 3. Bye-laws and regulations for the government of St. Matthew's were to be made by the church council of the defendants' church, together with their minister, and the minister of St. Matthew's, and might be altered or revoked. 4. The trustees, vestry and congregation of the defendants were to call the first pastor and appoint all the officers of St. Matthew's, and fix their salaries. After the first pastor, the male members or pew-holders of St. Matthew's were to ballot for a pastor and recommend him to the trustees and vestry of the defendants, who were to accept him, or reject him and appoint another. 5. St. Matthew's Church and its officers were to be governed by the regulations to be made as before mentioned. 6. No moneys were to be expended or debt contracted on account of St. Matthew's, unless directed or authorized by the trustees of the defendants. The 7th. Related to the permanent closing of a gate on an alley adjoining the church lot. The 8th. Was in reference to a school being kept in the basement. There was a further proviso, that the defendants should not keep or put mortgages on the property to an amount exceeding $16,000. And if there should be a sale on any mortgage, and a surplus be realized beyond the incumbrances and the total cost to the defendants, it was to be paid to the Mayor and Recorder, and applied by them to build or purchase a new English Lutheran Church.

The points made by the complainants upon this deed are, 1,

That they, the congregation of St. Matthew's, as corporators of the United German Lutheran Churches, and also as a distinct congregation, are parties to the deed, and interested in its conditions. 2. That Birdsall did not and could not destroy their interest in those conditions by his release to the defendants. And 3. That the defendants conduct and acts in respect of the conditions after the release, were a contemporaneous exposition of their effect, in accordance with the complainants claim.

The complainants have entirely failed to prove any trust or understanding between the corporation of the United Churches and Birdsall, prior to their purchase of St. Matthew's, other than what may be derived from the deed; or any trust which attached to Birdsall on his purchase at the auction sale.

Mr. Birdsall, within about a year after his sale of the church, published a pamphlet giving an account of his agency in that affair, and he testifies that the pamphlet is true in every thing but a matter of opinion therein expressed. In that publication it appears that the sale of the church at auction was positive and without reserve, and the auctioneer notified bidders that the officers of the church had not authorized any person to bid for their account; and whoever did bid, would do it on their own responsibility; and Birdsall, in his written proposition to the defendants, announced that he had made the purchase solely and on his own account.

He testifies that one inducement for his selling the church to the defendants was, his believing, from conversations with individuals in their society, including their minister, that it would be kept as an English Lutheran Church.

All this was expressed in the conditions which were inserted in his grant to them, and whatever was not expressed, must be taken as abandoned before the completion of their purchase.

It is plain that Mr. Birdsall had a perfect title to the church, unaffected by any trust or understanding. He could have sold it to the Roman Catholics, if he had thought proper to do so. His pamphlet shows that he did intend to sell it to the Episcopalians if he could not sell to the defendants Whatever was the consideration of the sale, it was therefore a consideration in which he was interested solely and exclusively. Looking at the deed

for our information, we learn that he sold the church in consideration of the price which he had paid for it, and of the conditions under which the grantees received it.

It is said that the property was then worth $30,000. It had brought but $22,750, at a public sale two months before, which is one test of its value. But assuming that it was worth $30,000: the difference of $7250 belonged to Birdsall, and to him alone. On that assumption, I may say that on the sale being made to the defendants, they contributed $22,750, and Mr. Birdsall $7250, to the common object of vesting the church in the defendants corporation for charitable uses. The defendants already had in possession their $22,750, for a specified charitable use, from which they could not divert it, viz.: the support of the Evangelical Lutheran doctrine and worship. If language were to be deemed a portion of the use on which they held it, (which is one of the points urged by the complainants in reference to a prior era of their church,) then they could only apply that property for the support of German preaching, and the diversion of it in the purchase from Birdsall to the maintenance of English preaching, would have been a clear breach of trust.

But waiving that point, this corporation invested the $22,750, for the eleemosynary purposes of its institution; and Mr. Birdsall invested the $7250, having in view the English tongue, as the instrument to be used in effecting those purposes.

The inquiry then is, what was the nature of the estate, legal and equitable, which the defendants acquired by Birdsall's deed? On the one hand, it is contended that the estate was conditional; on the other hand, that it was a trust.

In the first place, the language of the deed is that of a grant upon conditions. The words are, "*upon the conditions following*," and "*provided, nevertheless*," &c.

When the deed was executed, there was no person except Birdsall, who had an interest in the conditions, or could enforce them. In a trust, the *cestui que trust*, or beneficiary, can require it to be executed. Here there was no person, or class of persons, then in being, who were named as *cestuis que trust*, or who were intended as such. The deed discloses none. It cannot be said that the congregation of the extinct corporation of St. Mat-

thew's was in view, because the proof shows that they had already left and organized the new church of St. James, or were engaged in organizing it, and presently attached themselves to it. Nor can it be said with propriety, that the prospective English congregation which was to be gathered in St. Matthew's under the new arrangement, were the *cestuis que trust.* The deed shows that, so far as they were to belong to any class or society known to the law, that congregation was to be a dependency, a species of colony of the United Churches; and, like many colonies of modern nations, were to be governed by the parent state, without having any voice or part in such government. In short they were not to be corporators or members of the United Churches. They might become members of the English congregation of St. Matthew's, and worship in the church, so long as the owners should think it meet to hire pews to them, and keep up the English service there. The extent of their right would be for the year that they rented their pews. No one could compel the defendants to admit him to hire a pew in the first instance, or to continue it to him a second year. And no member of the English congregation to be convened there, could have a vested right in any thing pertaining to the church beyond the period for which he rented a pew, or contributed in some other form prescribed by the defendants, to the support of the service in such church. In either mode, his right would rest upon his compact with the defendants for the period specified for such pew-rent or contribution, and not upon Birdsall's deed. I am convinced that the deed contained no trust for any person or persons, or any class of persons, who could claim for themselves the character of *cestuis que trust.*

The only rational mode of construing the deed, is, to hold that it created *a charitable use;* the fund for which flowed from the defendants and Mr. Birdsall. They were the exclusive donors of the charity. In this deed they defined its purposes, and created the defendants the almoners for its dispensation. As such almoners, the defendants were vested with the exclusive power of selecting the objects of the charity. They could admit whom they pleased to hold pews in the church; they could exclude such as they pleased, including Mr. Birdsall himself. But they could

not suspend the exercise of the charity, by discontinuing English preaching, and devoting the church to some other use; at least without the consent of their associate donor. In using the word *charity*, I intend it only in its proper legal sense, which embraces churches, colleges, and all eleemosynary institutions.

To recur to the complainants view, what were the vested rights which any one, or all of the English congregation which the Rev. Mr. Geissenhainer, Jr. collected together in St. Matthew's under the new regime in 1827, had under, or by virtue of this deed? Neither the one nor the whole were donors of the fund, grantees of the estate, or heirs to the conditions reserved. They were simply Lutherans who had come into that congregation to worship, because they approved of the service and the locality. They contributed nothing but their pew rents, and for those they received the stipulated remuneration in the occupation of the pews, and having the English service administered to them under the defendants auspices, and chiefly at their expense. When their terms in the pews expired, their interest in a legal sense was at an end.

I will put a parallel case, by way of illustration. Two benevolent persons propose to try the experiment of establishing a Lutheran Church in the eastern part of our city, for the benefit of German emigrants, and to that end to have the service in German, as long as it should be deemed expedient. One contributes $20,000; and the other $5000. They buy a suitable place of worship, procure it to be conveyed to a mutual friend, expressing the donors names, and the objects for which it is to be used. The largest contributor undertakes, in addition, to pay the expenses of sustaining the service. He accordingly hires a minister, the house is opened for public worship, sundry German residents come in and form a spiritual society, and the service is kept up for three years at a considerable cost to the principal donor. He then finds that the society is but a handful, and he concludes it is not sufficiently numerous to warrant the expense which is required to keep up the German service. He confers with his associate donor, who agrees with him in this conclusion; and the associate, in consideration of the other's having sustained the service three years, and his undertaking to devote the edifice

which they bought to pious uses for all time to come, joins with the principal donor and the friend in whom the legal title is vested, in executing a conveyance, transferring the title to the principal donor, discharged from all conditions, save that it be perpetually devoted to the substituted pious uses.

Could any member of the German Society collected in such church, gainsay such a transfer? Most assuredly not.

It would doubtless be unpleasant to that society to be broken up and dispersed. But they would have acquired no legal right to be kept together at the expense and charge of the founders. If strong enough to buy a place of worship and sustain themselves, they could still continue together. If not able to do that, it is a misfortune, for which, in their case, there is no remedy. They have no vested right, which enables them singly, or as a class, to insist that they shall always have the benefit of the church and the service so provided.

If the donors had both died without any revocation, the charity would have to be enforced, in the name and behalf of the sovereign people by their Attorney General. I speak of a charity which is not vested in any corporate body. And it would be no longer revocable, or subject to alteration, except by the legislature. (*Attorney General* v. *Mayor of Rochester*, 2 Simons' R. 34.)

Almost all charitable uses raised by a single individual have been given by will. Hence we have very few instances of any revocation or change in them, made by the donors; and no adjudication respecting them, so far as I have seen.

Without going the length of holding that an unqualified gift for a charitable object when executed by delivery, may be revoked or diverted by the donor; I have no doubt but that, in the case before me, it was perfectly competent for Mr. Birdsall to release, and extinguish the conditions which he had annexed to the grant of this property. They were, by operation of law, reserved to him as the grantor in the deed. (Cruise's Digest, Title 13, ch. 1, § 17, and ch. 2, § 42 to 50.) He was the only person from whom the consideration (if any there were) for those conditions had proceeded. No person, or persons, had acquired a vested interest in their performance. The interests of the

English congregation did not continue beyond the day of the annual renting of the pews, and rested more upon the contract for the pews, than upon the conditions in the deed. That temporary and usufructuary right was respected by the defendants.

When the defendants found, in 1830, after a fair trial of the experiment, that it did not answer their expectations, they were at liberty to sell the church to any person or society, after offering it to the English Lutherans then worshipping there. No one can imagine on the case before me, that the mere handful then remaining in St. Matthew's would, or could have purchased it. Other Lutherans were not embraced in the terms of the pre-emption. It had virtually come to this point, that the defendants would no longer waste their income to furnish English preaching in an empty church; and unless permitted to use it for their own large congregation, would have sold it absolutely. The alternative was thus presented to Mr. Birdsall, whether it should be sold and thus go to strange, and perhaps obnoxious owners, or whether he would discharge the conditions in his deed, thereby securing its perpetual devotion to the purposes of a Lutheran Church. He preferred to relinquish the use of the English tongue, to suffering it to be desecrated by strangers to the Lutheran faith. The only change made by the release, was to leave the defendants at liberty to use such language as they pleased. I speak now of the real and essential change. I have no doubt of his right to permit this change; and I cannot say that he acted unwisely.

The release executed by Birdsall on the 2d of April, 1830, therefore discharged the defendants from the conditions contained in his deed of the property in question; and from that time they held it subject only to its being used as a Lutheran Church.

The offer to sell, subsequently made by the defendants in the terms of the second condition, and their treating with the English vestry, and allowing English preaching half the time, cannot affect their legal rights. There was no waiver at any time; and if in January, 1840, the then trustees had been persuaded that Birdsall's release was unavailing, and had expressed that opinion, it would be of no weight; of no more than was Bird-

sall's assertion in his pamphlet, that he had the unquestioned right to release if he pleased. A mistaken view of the law, and of their rights, could not, of itself, change the law, or impair those rights.

I have said nothing of the standing of these complainants in respect of this question. Some of them, certainly, persent a curi-ous claim, when they ask the court to declare that they are or were parties to Birdsall's deed, or interested in its conditions. I allude to the nine complainants who were the vestry of St. James's Church.

It is illustrative of the expansive as well as vague and indefi-nite character which is sought to be impressed upon the condi-tions in this deed, that a separate and distinct incorporated church, which never worshipped in St. Matthew's up to the com-mencement of this suit, should be struggling under cover of those conditions, to effect a permanent lodgement of its whole body, in that church edifice.

I am called upon to uphold those conditions, not in favor of the congregation which came in under Mr. Geissenhainer, Jr., and gradually wasted away between 1827 and 1840; but in fa-vor of an entirely distinct society, whose real grounds for com-ing into this church appear to be, that they are Lutherans, wor-ship in English, number among their members several who in bye-gone years worshipped in St. Matthew's, and that the church had become conveniently empty of English worshippers, so that there was room for St. James's.

As to the allegation that the defendants pursued a tortuous course to obtain a partial possession of the church, and there-upon to turn out the English party; it is sufficient to say, that they took the full and entire possession in December, 1826, when the prior English church of St. Matthew's left in a body and went to St. James's. The defendants have had the legal pos-session ever since. Their allowing an English congregation to worship in the church, was no ouster of their own possession.

Some stress was laid upon the contribution of members of St. Matthew's towards the defendants purchase of Birdsall.

The only proof on this subject is the admission in the answer, which is, that at the time of the purchase, $2613 69 was by

various persons contributed towards enabling the defendants to make the experiment of maintaining English worship in St. Matthew's. It does not appear that any of the complainants, or any prior member of St. Matthew's Church, contributed. And it is proved that the experiment, for three years, cost the defendants nearly double the amount so contributed.

The omission of the word "assigns," in Birdsall's release, was urged as showing that he did not mean to discharge the whole, or more than his own right as a member of St. Matthew's congregation. The release was to the corporation and their successors. No other words were necessary to release in fee.

IV. There remains one prominent point on which the complainants ask a decree, viz. the offer of the defendants to sell St. Matthew's, as made in December, 1839, and the complainants acceptance of that offer in January, 1840. This is insisted upon as a contract, which should be specifically performed.

Although the point is based upon a contract, some other matters are brought in with it, which I will first mention.

Thus it is connected with the second condition contained in Birdsall's deed; which having been released, has no bearing upon the case. And the recorder's certificate is of no consequence, except as it contains terms making a part of the offer to sell.

So the idea that the complainants, or the parties offering to accept and buy the property, have a right to set-off the Union bond, or any thing else, against the purchase money, is to be laid wholly out of view.

The defendants are to be regarded as the owners in fee in possession of this property, subject to no restriction except that it shall be used for a Lutheran Church.

I will now look into the offer and the acceptance.

The offer was signed by the Secretary, and purported to be and was made by order of the defendants trustees. It described the property sufficiently, and offered to sell it "*to such Germans or descendants of Germans who may be members of or pewholders in St. Matthew's Church*, at $22,750, the purchasers binding themselves, their successors and assigns, to use and oc-

cupy the same as a Lutheran Church, in which divine service should be performed in the English tongue. The notice stated that the board of trustees would meet at St. Matthew's Church at eight o'clock P. M. on the 3d, 10th, 17th, 24th, and 31st of January, 1840, in the vestry room, and that written applications to purchase, designating the names and addresses of the proposed purchasers, would be received by the board, if delivered to their attorney, Mr. Derry.

The first acceptance tendered, was dated January 6th, 1840, and was signed by Mr. Cammeyer, one of the complainants, and he thereby agreed to take the church for the sum of $22,750, in trust for an English Lutheran congregation in said church. The " *Terms of payment to be agreed upon.*"

Mr. Cammeyer was the descendant of a German, and a member and pew-holder in St. Matthew's Church.

The second acceptance, dated January 16th, 1840, was signed by Messrs. Birdsall, Otten, Reinicke, Aims, Surre, and Cammeyer, as a committee of Germans or descendants of Germans as described in the offer, duly appointed. It ratifies Mr. Cammeyer's acceptance, (which was inclosed in it and again sent,) and thereby in behalf of their constituents, they agreed to purchase the church on the terms in the defendants notice mentioned, provided a good and available title were given under the authority of the court of chancery, or otherwise as counsel might advise. They claimed a written assent on the part of the defendants, and notified them that their omission to give such answer, would be taken as a tacit assent, and the contract enforced accordingly. The word "*purchaser*" was appended to Mr. Cammeyer's signature.

On the 29th of January, 1840, another letter was delivered to the defendants board, signed by Messrs. Cammeyer, Otten, Reinicke, and Birdsall, as a committee; informing the board, that so soon as the deed was prepared by them and approved of by the committee's counsel, Mr. Anthon, the signers would pay them the price, which they were then ready to do. The deed to be made to such persons in trust for the congregation of St. Matthew's, as counsel on both sides might deem discreet; and the committee were prepared, in the mean time, to execute any con-

tract to bind the congregation of St. Matthew's which might be deemed prudent, and which might be approved by their counsel.

The defendants made no answer to either of these proffers or acceptances.

It is charged upon them that they were not sincere in offering to make the sale; and their course in omitting to answer the persons proposing to accept, or to explain to them wherein their proposals were deficient, gives color to the accusation. With the morality of the proceeding, this court has no concern. I am not to decide whether they did right. It is my duty to ascertain whether they entered into an obligatory contract for the sale of this property.

And 1. It is objected that the defendants offer was made to the world at large, or to a large class of persons; and that there could be no contract until the portion of such class which proposed to accept, was ascertained and accepted by the defendants as the purchaser.

There is much force in this argument, especially as it is contended on the other side, that a part only of the class described in the notice, were entitled to avail themselves of the offer. Thus, if after the offer of acceptance made by Mr. Cammeyer, or after the second acceptance tendered, and within the time limited, there had been another acceptance tendered by four other German pew-holders in St. Matthew's: to which set of purchasers would the defendants be bound? And if, on receiving the first proposal, they had executed a deed accordingly, would that relieve them from the consequences of the last proposal? There is nothing in the notice which gives to the first acceptors any preference over any others who may come in before the 31st of January.

The difficulty can be obviated only by holding, that all the class described, should join in the acceptance; or that there would be no contract, until the defendants had received and accepted the proposal of such of the class as should offer to purchase. The clause in the notice relative to receiving *applications to purchase*, corroborates the latter construction. On neither ground, are the defendants liable to complete the sale.

2. It is evident that the notice contemplated no *executory con-*

*tract* between the parties. It was an offer, for a fixed price, with notice of the times and place where the board of trustees were to be found to complete the sale. They designed to receive the applications, act upon it, receive the price, and deliver a deed. It was not necessary that they should add to their notice, that the sale would be for cash. The law adds that, where there is no offer or agreement to sell on credit. *Boys* v. *Ayerst*, 6 Madd. (1 Madd. & Geld.) 316, 325; *Hogan* v. *Shorb*, 24 Wend. 460, per Bronson, J.

3. If any acceptance short of that of the whole class of pew-holders, Germans or the descendants of Germans, would have met the offer, it should have been unconditional, and given the names and addresses of the proposed purchasers. And it should have been followed up, by a tender or direct offer to the board, to pay them the price. ( *Wells* v. *Smith*, 7 Paige, 23, 24; per Chancellor.)

There is no proof of any such tender or offer. The letter of the 29th of January, announces that they are ready to pay the price, as soon as the deed is prepared and is approved by their counsel. That was not sufficient; but if it were, it is not proved.

There is no evidence of any intention, on the part of any or all of those proposing to accept the offer of sale, actually to pay the $22,750, or any part of it; much less that they were prepared to pay it. On the contrary, the claims made in the bill, and the points and arguments of the complainants at the hearing, show beyond question, that they did not intend to pay for the property otherwise than by setting off against the purchase money, the Union bond and the various other equities which have been heretofore examined. If those claims had been valid, and the acceptance tendered had completed a contract, these parties could not have offset them and required a deed. It was a sale for cash, not for old claims. By the acceptance, the parties agreed to pay in cash. And they must pay or tender it, or they lose the benefit of the purchase. (See *Dawson* v. *Dawson*, 8 Sim. 346.) Where the sale is on a credit, the case would be different.

There are many other questions arising upon the force of the defendants offer and the alleged acceptance.

4. In relation to the first proposal, which was made by Mr. Cammeyer.

The defects in it are two. *First*, it is made by Mr. C. alone, whereas the offer of the defendants cannot be satisfied by the acceptance of less than two of the prescribed class of persons. The clause by which he proposes to take the church in trust for an English Lutheran congregation, does not remedy this difficulty. There would still be but a single purchaser, and if conveyed in trust, but a single trustee, neither of which events is contemplated by the offer of sale.

*Second.* It is an insuperable defect, that Mr. Cammeyer did not accept unconditionally and without qualification. Instead of saying he would take the church and pay the price, which would have been an agreement to pay in cash; his acceptance was clogged with a proviso that the terms of payment were thereafter to be agreed upon. In other words, it was no more than saying that he was ready to buy at $22,750, if they could agree upon the terms of payment.

There was no meeting of the minds of the contracting parties upon all the essential points of the agreement. One proposed a payment in cash in hand, the other a payment in some other mode or time to be settled between them. This was not an acceptance of the offer. In *Eliason v. Henshaw*, 4 Wheaton's R. 225, the plaintiff wrote to the defendant offering to buy two or three hundred barrels of flour at a certain price, and requested an answer whether the offer was accepted, by the return of the freight wagon which carried the letter. The letter was written near Harper's Ferry. The wagon did not return there, and the defendant answered the letter by mail, addressed to Georgetown where the plaintiff resided, and thereby accepted the offer. It was decided that the acceptance being communicated to a different place from that indicated by the plaintiff, imposed no binding obligation upon him. Mr. Justice Washington, delivering the opinion of the court, said that the offer of a bargain by one person to another, imposes no obligation upon the former until it is accepted by the latter according to the terms in which it was made. Any qualification or departure from those terms, invalidates the offer, unless the same be agreed to by the person who made it.

Mr. Sugden, speaking of contracts by letters between the parties, says, "The letters will not constitute an agreement, unless the answer to the offer is a simple acceptance, without the introduction of any new term." (1 Sugd. on Vendors and Purch. 165 —(118) Chapt. 3, Sec. 3, § 14.)

The English authorities fully sustain this doctrine.

In *Kennedy* v. *Lee*, 3 Merivale, 450, 451, Lord Eldon held, that where the acceptance of a proposal of sale, left some essential particulars to be afterwards settled, there was no evidence of a contract. In *Boys* v. *Ayerst*, 6 Madd. (1 M. & Geld.) 316, 324, the offer provided for payment within a fortnight after a certain building should be removed from the premises sold. The acceptance was to pay within a fortnight after its removal, the plaintiff to name the time within which it should be removed, and such time to be inserted in a formal agreement. It was held that the latter clause added a further term to the offer, which required the assent of the other party before it became a contract.

In *Holland* v. *Eyre*, 2 Sim. & St. 194, the proposal was to buy of Holland, a lease for ninety-seven years, which he was to have of one Burton. Holland's letter in answer, accepted the offer, and agreed to grant a lease to Eyre on the same terms as the lease he held from Burton. It was held that Eyre was not bound, because his offer was to take *an assignment of the lease*, and the acceptance was restricted to granting *an under lease.*

In *Rutledge* v. *Grant*, 4 Bing. 653, (1 Moore & Payne, 717, S. C.,) the defendant offered in writing to purchase a house on specified terms; *possession to be given on or before the 25th of July then next,* and the plaintiff to give an answer within six weeks. On the 6th of April, and within three weeks, plaintiff wrote a note to the defendant accepting the offer, and stating he *will give possession on the 1st of August then next.* Defendant on the 7th of April wrote, desiring to withdraw his proposal, and the plaintiff would not assent. After this, and within the six weeks, the defendant withdrew his proposal, and the plaintiff sent a note to him acceding to his original offer, and agreeing to give possession on or before the 25th of July. The plaintiff tendered a conveyance, and the possession before that day, which being rejected, he sued the defendant upon the contract. The court

decided, that before the offer was accepted, the defendant might withdraw it; and that the plaintiff's first note accepting with a modification as to the possession, was not an acceptance of the offer. The Chief Justice said, that until both parties are agreed, either has a right to be off.

In *Smith* v. *Surnam*, 9 Barn. & Cres. 561, Smith, the owner of growing trees, agreed verbally with Surnam, to sell him the timber at so much per foot. Afterwards Smith wrote to Surnam requiring him to pay for the timber which he had bought of Smith. Surnam wrote a letter in answer, stating that he had bought the timber, but it was to be sound and good, and that it was not sound.

It was held to be a contract for the sale of goods, and not for an interest in lands. And that as the purchaser did not in his letter recognize the absolute contract described in the vendor's letter, but stated one conditionally as to quality, there was no note in writing of the bargain to satisfy the statute of frauds.

In *Hyde* v. *Wrench*, 3 Beavan, 334, the defendant by writing, offered to sell a farm for £1000. The complainant, in answer to this, offered him £950; which, after a few days consideration, the defendant declined. On the day he received the refusal to take £950, the complainant wrote a letter agreeing to the terms of the offer at £1000. No specific answer was made to this letter. On a bill to compel the defendant to perform the agreement, the court decided that no binding contract existed between the parties. That by the offer of £950, the complainant rejected the offer to sell at £1000, and it was not competent in him to revive the proposal of the defendant by subsequently tendering an acceptance of it.

On these grounds Mr. Cammeyer's note cannot be deemed an acceptance of the offer of sale.

5. The next proposal to accept, came from him as purchaser, and as one of a committee agreeing in behalf of the class to whom the church was offered, to purchase it on the terms specified in the notice. They describe themselves as "*a committee of such Germans*," that is, of Germans or the descendants of Germans who were members of, or pew-holders in, St. Matthew's Church.

As they were *a committee of such Germans*, the letter was equivalent to a statement that the committee-men were also such Germans ; and the defendants had a right to infer that their constituents were just such Germans as the members of the committee.

Now it appears that Mr. Birdsall, one of the committee, was neither a German nor the descendant of a German. It is not proved that any of the others were, except Cammeyer. But if they were, it is proved that Mr. Surre was not a member or pew-holder in St. Matthew's, and it appears by the bill, that he as well as Messrs. Aims and Ogden, were members of the board of trustees or vestry of St. James's Church.

Thus, four out of the seven members of the committee, did not belong to the class of persons to whom the defendants offer was made. And as their acceptance was in behalf of themselves and persons like them, it was not an acceptance by *such Germans* as those to whom the offer was made. The defendants did not offer the church to a mixed class of Lutherans, consisting of Irishmen, of office-bearers in St. James's Church, and also of members of St. Matthew's, who were Germans, or German descendants. The offer was to the latter exclusively ; and they had no right to associate with them, either of the former.

If I should offer to sell a house to my friend A., the acceptance of the offer by A. and a stranger B., would impose no obligation upon me.

A further objection to the letter of the committee is, that it formally ratifies the offer made by Mr. Cammeyer. It proceeds to say, that they agree to purchase on the terms in the notice mentioned ; but as Cammeyer's offer required the terms *of payment* to be agreed upon, the word *terms* in the committee's letter would, on construing the two offers together, be limited to the other stipulations and conditions contained in the notice, excluding the time of payment. It was thus subject to the same difficulty of its being a qualified acceptance.

If this construction be not clear, it is at least left in doubt upon the two letters, whether the committee intended to accept, payable in cash on delivery, as the offer was, or to negotiate the terms of payment.

And where there is such a doubt, the court will not decree a performance of an agreement resting upon letters. (*Huddleston* v. *Briscoe,* 11 Ves. 591, per Lord Eldon, Chancellor; *Stratford* v. *Bosworth,* 2 Ves. & Beames, 346, per Sir Thomas Plumer, Vice-Chancellor; and see *Abeel* v. *Radcliff,* 13 Johns. 297.)

There is still another objection to this offer, so far as it purports to have been made in behalf of others. The authority from the others is not proved.

6. The third letter of acceptance is founded upon and refers to the second. It, of course, is not of any greater force.

This letter is also signed by Mr. Birdsall, who was not within the offer, and it departs widely from the offer, in substituting a conference of counsel on both sides to determine in whose names the title shall be taken, and proposing a formal executory contract to be executed in the meantime.

7. Every contract for the sale of lands is void, unless the contract, or some note or memorandum thereof, expressing the consideration, be in writing, and be subscribed by the party by whom the sale is to be made. (2 R. S. 135, § 8.)

The defendants offer, though signed by them, constituted no agreement. (*Burnet* v. *Briscoe,* 4 Johns. R. 235.)

If the proposals made by Mr. Cammeyer and others, are to be deemed as making a contract in connection with that offer; the only consideration for it on the part of the defendants, is the promise on the part of those gentlemen to accept the lands and pay the price. Taken together, they make a contract resting upon mutual promises.

By the statute just cited, the consideration must be expressed in the writing subscribed by the party making the sale. In other words, if the consideration be the promise of the purchaser, that promise must be expressed in the writing which the seller executes.

There is no such instrument in this case. The offer signed by the defendants contains no expression of the consideration upon which they are sought to be charged.

The effect of the change made in this respect in the revision of our statutes in 1830, is to require contracts for the sale of lands resting upon mutual promises, to be subscribed by both the buy-

er and seller, to be obligatory on the latter; and it has virtually done away with the making of contracts for the sale of lands by letters between the parties. A happy consummation, which Lord Eldon was desirous of having accomplished in England.

The Chancellor has decided, that under our present statute of frauds, a contract for the sale of lands, must not only be in writing and signed by the vendor or his agent, but it must be subscribed by the purchaser also. (*Mc Whorter* v. *McMahon,* in chancery, Nov. 21, 1843.)(*a*)

See also *Davis* v. *Shields,* 26 Wend. 341, in the Court for the Correction of Errors, decided on the clause of the statute relative to sales of goods and chattels.

On these various grounds, I must hold that no valid contract was made by the defendants for the sale of St. Matthew's Church.

8. If the complainants had succeeded in substantiating a claim to the specific performance of the alleged agreement for the sale of St. Matthew's on the part of those who accepted it; the complainants are not those vendees, nor are they members of the class of persons to which the church was offered, or in behalf of which it was avowedly accepted. The vestry of St. James's Church did not belong to that class, and had no right or interest in the contract.

V. As to the complainants point that several of the defendants trustees are aliens, I might pass it by, with the remark that their right is not to be questioned in this mode. I will add, that there is nothing in the point. The title is in the *corporation,* which is not an alien, even if all the corporators were aliens. The latter have no vested rights as *cestuis que trust,* in the real estate. And if they had, it would be their rights, and not the legal estate of the corporation, which would suffer the consequences of their alienage.(*b*)

(*a*) Since reported, 10 Paige, 386.

(*b*) On this point, see *March* v. *Attorney General,* 5 Beavan, 433; also *Bligh* v. *Brent,* 2 Y. & Coll. 268.

Our banks, insurance companies, trust companies, rail-road companies, and innumerable other corporations, whose property is represented by transferable shares, own large amounts of real estate ; and a large number of their shares of stock are owned by aliens, both resident and non-resident. In such stock they have an absolute and vested interest, which in degree and character is wholly unlike the mere right by sufferance, which is held by a pew-holder from year to year in a church. Yet I believe it has never been questioned, but that aliens had a perfect right to own stock in those corporations, and to officiate as directors if the stockholders thought proper to intrust them with that duty.

In *The Commonwealth* v. *Woelper and others,* 3 Serg. & Rawle, 29, 34, 40, which was a suit relative to an election held in the same Lutheran Church of St. Michael's in Philadelphia, which I have before spoken of, it was decided by the Supreme Court of Pennsylvania, that aliens had a right to vote under a provision in the charter which declared that the officers should be chosen by the contributing members being communicants of the congregation.

VI. The defendants made some formal objections to the bill and to the relief prayed.

1. That the bill was multifarious. It was said at the hearing, that a demurrer on this ground had been overruled by the Vice-Chancellor. The decision on the demurrer cannot be reviewed here.

The misjoinder of the complainants is another difficulty. I have observed heretofore, that many of these complainants do not, in any form or aspect of this case, show any title to participate in the relief sought ; even if the others had established the claims, or any of them, which are brought forward in the bill.

This is unquestionably a fatal objection to the bill. (*King of Spain* v. *Machado,* 4 Russell, 225 ; *Paige* v. *Townsend,* 5 Simons, 395 ; *Cowley* v. *Cowley,* 9 ibid. 299 ; *Clarkson* v. *De Peyster,* 3 Paige, 336 ; *Anderson* v. *Wallis,* 4 M. & C. 336, affirmed, 1 Turn. & Phill. 202 ; S. C. 5 Lond. Jur. Rep. 458, and 7 ibid. 119.)

I have examined the cause without regard to these technical grounds, because a decision upon them alone, would only lead to a renewal of a litigation which ought to be deprecated by all who value Christian order, peace, and brotherly kindness.

The bill must be dismissed, with costs, and the injunction dissolved.